**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John J. PAPPERT, Defendant–Appellant.**

No. 95–3071.

United States Court of Appeals, Tenth Circuit.

Jan. 24, 1997.

Tanya J. Treadway, Assistant United States Attorney (Randall K. Rathbun, United States Attorney, with her on the brief), Kansas City, KS, for Plaintiff–Appellee.

Daniel E. Monnat, Wichita, KS, for Defendant–Appellant.

Before TACHA, COFFIN,* and LUCERO, Circuit Judges.

LUCERO, Circuit Judge.

Defendant-appellant John J. Pappert, principal in an office equipment business, appeals from his conviction for three counts of mail fraud, four counts of wire fraud, and two counts of submitting false documents to a federally insured financial institution. *See* 18 U.S.C. §§ 1341, 1343, 1014. Pappert challenges (1) the district court's rulings on jury instructions involving good faith and materiality; (2) the sufficiency of the evidence of intent to commit fraud, use of the United States mails, and knowledge of submission of false documents to a federal bank; and (3) several sentence enhancements. Our jurisdiction arises under 28 U.S.C. § 1291 and Fed.R.App.P. 4(b). We affirm in part, and reverse in part.

I

Pappert was the president and majority shareholder of Century Office Products, In-

corporated ("COPI"), a business that leased, sold, and serviced photocopier machines and other office equipment from its inception in 1980 until its demise in 1993. Pappert managed the finances and day-to-day operations of COPI, and was in charge of leasing.

COPI's leasing operation worked as follows: a representative of the company would initiate a leasing agreement with a customer, and Pappert would usually close the deal. Many of these customers were schools and school districts. Pappert sold most leases to banks or other financing sources, sometimes through a lease broker. These financing sources would pay COPI in exchange for the rights to income from the lease and to the equipment itself. If the transaction took place through a broker, the broker would pay COPI and execute a second assignment to the financing source.

COPI's practice of assigning leases was a key issue at trial. Each lease agreement contained a provision allowing COPI to assign the lease to third parties, and permitting reassignment. COPI was not obligated to notify customers of assignments, and Pappert often did not do so. In some instances, he would tell customers that he would not sell their lease, then would proceed to do so. Although Pappert claims that customers were given the choice to pay either COPI or the financing source, some customers testified that they were simply told to pay COPI and never learned that their leases had been assigned.

Periodically, Pappert would offer to replace his customers' old machines with new equipment. He convinced the customers that he would "pay off" the old leases if the customer would take out new leases on better, more up-to-date equipment. If a customer agreed to enter into a new lease, Pappert would substitute the new equipment for the old. However, his practice was to take over the installments *without* paying off in full the old lease. It was in this fashion that customers unwittingly became liable on multiple leases.

---

\* The Honorable Frank M. Coffin, Senior Circuit Judge for the United States Court of Appeals for the First Circuit, sitting by designation.

Pappert also misled lending institutions by replacing equipment and taking over the customers' payments on their old leases without informing the lenders. Many creditors thought that the original equipment was still in place and the customers were still making payments. Representatives of the financial institutions testified that if they had known of Pappert's repossession, they would have at least reevaluated the creditworthiness of the transaction. Most indicated that they would not have accepted the new arrangement because COPI did not have the good credit of their school district customers.

Ultimately, Pappert's operation began to implode. As he fell behind on more and more payments, several financing institutions began to call in Pappert's debt. This led him to submit forged leases through his lease broker to another bank, Superior National Bank, in an attempt to bring in cash. When that bank notified the lessees of their delinquency, the lessees discovered Pappert's ruse.

Nonpayment on the customers' many leases eventually led the financing sources to seek payment directly from the lessees. A slew of lawsuits ensued. The government tells us that 39 entities lost over $5.5 million, and Superior National Bank was put into receivership as a result of Pappert's conduct.

## II

■ Pappert makes two arguments challenging the trial court's jury instructions. "The appropriate standard of review for challenges to jury instructions is whether the jury, considering the instructions as a whole, was misled." *United States v. Smith,* 13 F.3d 1421, 1424 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 209, 130 L.Ed.2d 138 (1994). Only where the reviewing court has "substantial doubt that the jury was fairly guided" will the judgment be disturbed. *Id.* (quoting *United States v. Mullins,* 4 F.3d 898, 900 (10th Cir.1993)). We review de novo to determine the propriety of a jury instruction to which objection was made at trial, and for plain error where no objection was made. *Id.*

## A

■ Pappert first contends that the court was wrong to instruct the jury that "it is no defense to a charge of mail fraud or wire fraud that the defendant honestly believed in the ultimate success of his business," Appellant's Partial App. at 53 (Instruction No. 22), while failing to instruct them that "good faith" in one's representations is a defense. At trial, the court overruled Pappert's request that the court give "the good faith instruction as I commented in chambers." Tr. at 748. No record is available of the conference in chambers. Pappert did not object to the inclusion of the "honest belief" instruction.

■ Applying de novo review, we conclude that the lack of an instruction on good faith, considered in light of the entire set of instructions, was not misleading. Although Pappert insists that the good faith instruction was essential to his defense, a defendant is not entitled to such an instruction without a reasonable factual predicate. *United States v. Grissom,* 44 F.3d 1507, 1512 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1720, 131 L.Ed.2d 579 (1995).

There is sufficient factual support for this defense "when the jury could reasonably find ... that the defendant in good faith believed that the plan would succeed, that the promises made would be kept and the representations carried out." *United States v. Hopkins,* 744 F.2d 716, 718 (10th Cir.1984) (en banc). The record indicates that Pappert misled customers to think that he would pay off the loans in their entirety, sometimes sending written guarantees that loans would be paid off by a certain date, and on at least one occasion sending a copy of a check with which he falsely claimed a customer's loan had been paid off. In addition, he submitted falsified leases to financing sources. Finally, Pappert admitted to improprieties when called to task on his overdue debts, once referring to his own conduct as a "scam." In light of this record, we find that the jury could not reasonably have found that the defendant believed his own promises in good faith. Because there was not adequate factual support for the good faith defense, the

district court properly refused to give a "good faith" instruction.

■ Because objection was not made to the "honest belief" instruction at trial, we review the district court's instruction for plain error. *United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir.), *cert. denied*, ⸺ U.S. ⸺, 115 S.Ct. 209, 130 L.Ed.2d 138 (1994). "Plain error, in this context, is error that affects the defendant's right to a fair and impartial trial." *Id.* The court, in its instruction, accurately stated the law. *United States v. Reddeck*, 22 F.3d 1504, 1507 (10th Cir.1994) (" 'even though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations' " (quoting *United States v. Themy*, 624 F.2d 963, 965 (10th Cir.1980))). The evidence supported giving such an instruction. Therefore, the district court did not commit plain error.

### B

Pappert next asserts that the court erred in instructing the jury on the offense of submitting false documents to a federally insured financial institution. The court properly instructed the jury that materiality was an element of the offense, but added:

> You are further instructed that whether the statement was material is a question for the Court, and that the Court has determined that the statements in question were material as a matter of law.

Appellant's App. at 55–56 (Instruction No. 24). Although Pappert did not object to this instruction at trial, he claims that the court's failure to submit the element of materiality to the jury was reversible error under *United States v. Gaudin*, ⸺ U.S. ⸺, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), decided after this case was tried.

■ The first question before us is whether the district court erred. Materiality is an element of § 1014. *United States v. Smith*, 838 F.2d 436, 439 (10th Cir.1988), *cert. de-*

*nied*, 490 U.S. 1036, 109 S.Ct. 1935, 104 L.Ed.2d 407 (1989). Although we have held that materiality is a question of law, *see United States v. Haddock*, 956 F.2d 1534, 1550 (10th Cir.1992), we have been overruled by *Gaudin*, ⸺ U.S. at ⸺ – ⸺, 115 S.Ct. at 2314–15 (rejecting argument that materiality is a purely legal question). We now hold that materiality is a mixed question of law and fact that must ordinarily be submitted to the jury. It follows that the district court committed error in this case.[1]

■ After oral argument was heard in this case, the court on its own motion consolidated this case with two others, *United States v. Wiles*, No. 94–1592 and *United States v. Schleibaum*, 95–1022, to hear two issues en banc: (1) "whether the failure to instruct the jury on the issue of materiality ... constitutes a structural error" and if so, (2) "whether the error is reversible per se or reviewable under the plain-error analysis set out in *United States v. Olano*, [507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508] (1993)." *United States v. Wiles*, 102 F.3d 1043, 1067 (10th Cir.1996) (Lucero, J., concurring and dissenting). Pappert is the fortuitous beneficiary of the outcome of this process. A majority of the en banc court decided that the failure to submit an element of an offense to the jury, resulting in the jury failing to render a verdict on each element, is structural error, and, over the dissent of this author, held that the structural error is automatically reversible under both Fed.R.Crim.P. 52(a) harmless-error review and Fed.R.Crim.P. 52(b) plain-error review. *Id.* at 1057–58, 1060–61 (majority opinion). The en banc court then resubmitted this case to us for resolution under the newly-announced framework.

■ In a footnote to its en banc opinion, the majority noted that where the parties stipulate to the facts that establish the element of the offense and thereby removed that element from the jury's consideration,

---

1. We must note that the Supreme Court has granted certiorari in *United States v. Wells*, 63 F.3d 745 (8th Cir.1995), *cert. granted*, ⸺ U.S. ⸺, 116 S.Ct. 1540, 134 L.Ed.2d 645 (1996), to decide whether materiality is an element of an offense under 18 U.S.C. § 1014. If the Court ultimately concludes that materiality of defendant's representation is not an element of the offense, the district court's decision to withdraw the issue from the jury's consideration was not error.

no error arises from the failure to instruct. *Id.* at 1058 n. 10. On the other hand, " '[w]hen the only evidence *tends* to establish an elemental fact, or when the parties stipulate to evidence *tending* to establish an elemental fact, the jury must still resolve the existence or nonexistence of the fact sought to be proved.' " *Id.* (quoting *United States v. Mason,* 85 F.3d 471, 472 (10th Cir.1996)) (emphasis added in *Wiles* ).

Applying the principles derived from the en banc opinion, we conclude that in this case there was no apparent dispute as to the element of materiality. Materiality, in the context of § 1014, is the "capacity to influence the bank's decision." *Haddock,* 956 F.2d at 1550. In the defense's closing argument, counsel said:

> I do not dispute the fact that Superior National Bank acted on 108 and 109 [the forged documents].
>
> . . . .
>
> Now, my saying that I don't dispute the fact that something was submitted to Superior National Bank, i.e. 108 and 109, and that I admit not only would it tend to influence them, it did influence Richard Wright [former vice president of the bank]. Richard was correct in that respect. It influenced what he did. It had a tendency to influence. That doesn't mean that I am admitting, because I am not, that John Pappert had anything to do with those two transactions.

Tr. at 804. Because the jury found Pappert guilty on all of the other elements of § 1014, and because defense counsel appears to have conceded the element of materiality at trial and does not challenge it as a factual deficiency on appeal, we must determine whether "the failure to instruct on an element of an offense did not play a role in the jury's verdict on that offense." *Wiles,* 102 F.3d at 1058 n. 10.

Although Pappert's attorney appears to have conceded the element of materiality in closing argument, there is no suggestion from the record that Pappert and the government actually stipulated to the existence of that element. *Cf.* Appellant's App. at 55–56 (Instruction No. 24) (removing the element that the victim be a FDIC-insured financial institution because the parties agreed to the existence of this element, while removing the element of materiality from jury consideration because the court had found its existence as a matter of law). Because Pappert did not formally relinquish his Fifth and Sixth Amendment rights to have the jury decide the element beyond a reasonable doubt, the district court erred in deciding materiality as a matter of law. *See generally Johnson v. Cowley,* 40 F.3d 341, 346 (10th Cir.1994) (the court must determine whether the defendant personally agreed to the stipulation). As decided by the court en banc, this error is structural and must be reversed. Accordingly, we reverse Pappert's conviction on Counts 6 and 8 notwithstanding our view that based on review of the record as a whole, the error here did not affect the fairness, integrity, or public reputation of [the] judicial proceedings. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).[2]

■ In his brief to the en banc court, Pappert contends that the failure to instruct on the § 1014 counts created a spillover effect and tainted the other convictions. *See, e.g., United States v. Nash,* 76 F.3d 282, 285–86 (9th Cir.1996) (failure to instruct properly on false statements charge necessarily taint-

---

**2.** In its supplemental brief, the government argues that the jury could not have returned the verdict it did without also finding that Pappert's representations were material. In this regard, it notes that the jury found that Pappert intended to influence the banks with his representations. It thus argues that by finding intent, the jury found the "functional equivalent" of materiality. *See Sullivan v. Louisiana,* 508 U.S. 275, 281, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993) ("when the . . . facts are so closely related to the ultimate fact . . . that no rational jury could find those facts without also finding that ultimate fact, mak-

ing those findings is functionally equivalent to finding the element required to be presumed." (quotation omitted)). We disagree. Materiality, as defined for purposes § 1014, evaluates the statements from an objective standpoint. *See Haddock,* 956 F.2d at 1550. By contrast, the element of intent is subjective, depending instead on the defendant's state of mind. Pappert could have intended to influence the banks with statements that had no "capacity to influence the bank's decision." *Id.* The government's argument would render materiality a superfluous element.

ed instruction on ancillary bank fraud charge). Here, the failure to instruct on the § 1014 counts did not taint the mail and wire fraud counts ·because each count of the indictment clearly set out a separate offense, and the district court's error had no bearing on the remaining counts. *See United States v. Laughlin,* 26 F.3d 1523, 1529 (10th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 428, 130 L.Ed.2d 342 (1994) (in appraising any "spillover" effect, the reviewing court inquires into whether the jury was given a sufficient understanding of the applicable issues and standards).

Unlike *Nash,* in which the erroneous instruction on materiality was linked to the instructions as a whole, here the erroneous instruction stated only that *"statements in question* were material." Appellant's App. at 55 (Jury Instruction 24) (emphasis added). Reviewing the jury instructions as a whole, we find that the jury could not have mistakenly intertwined the materiality instruction in the § 1014 counts with the wire and mail fraud instructions; the erroneous determination of materiality is well cabined within § 1014 offense instructions. Considering that the jury acquitted Pappert on two of the mail fraud counts, the jury must have been able to separate out the issue of materiality and apply the instructions properly in the different contexts of the mail and wire fraud counts. *See Laughlin,* 26 F.3d at 1529 (expressing confidence that jury was able to differentiate between instructions on different counts, in view of the jury's acquittal on one count).

### III

■ The district court denied Pappert's motions for judgment of acquittal on grounds of insufficient evidence. Pappert challenges this determination on a number of grounds. In reviewing the district court's determination, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *U.S. v. Harrod,* 981 F.2d

1171, 1174 (10th Cir.1992). In answering this question, "we may neither weigh conflicting evidence nor consider the credibility of witnesses." *Harrod,* 981 F.2d at 1175 (quoting *U.S. v. Darrell,* 828 F.2d 644, 647 (10th Cir. 1987)). Applying this standard, we affirm the denial of defendant's motions.

### A

Pappert challenges the sufficiency of the evidence underlying his fraud convictions on two grounds. First, he claims that the prosecution failed to prove intent, because it was evident that he made his communications in good faith. He contends that his payment of installments on some of the leases that he took over, promising to "pay off," evinces this good faith. Additionally, Pappert contends that his "willingness and repeated attempts to work with his financing sources to correct the financial messes he had created" also suggests good faith.

In the previous part, we affirmed the district court's decision not to give a good faith jury instruction, because we found no reasonable factual predicate for a good faith finding. For the same reason, we reject Pappert's challenge to the sufficiency of evidence regarding his fraudulent intent. We find that the evidence regarding Pappert's misrepresentations supports the jury's finding on this matter.

### B

■ With respect to his mail fraud convictions, Pappert claims that the evidence failed to show the United States mails were used. For each of the three counts of mail fraud, witnesses testified that they received Pappert's letters via the United States mail. In addition, the jury saw the documents in question, which were folded in thirds as if sent in a standard envelope, and heard testimony on Pappert's normal course of business with respect to transmitting letters. Although the defendant suggests the evidence is conflicting and incredible, such assessments lie within the province of the jury. Viewing the evidence most favorably to the prosecution, we find it sufficient to convince a

rational jury beyond a reasonable doubt that the letters were sent via United States mail.

## IV

■■■ Pappert claims that the district court erred in enhancing his sentence under various sentencing guidelines. Pappert was sentenced to 60 months for his conviction on the first count of the indictment, and to 97 months on each of the eight other counts of which he was convicted. The sentence for the counts were to run concurrently. We review the district court's interpretation and application of the sentencing guidelines *de novo*. *United States v. McAlpine*, 32 F.3d 484, 487-88 (10th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 610, 130 L.Ed.2d 520 (1994). We review the court's underlying findings of fact for clear error. *Id.* at 488. We will accept these factual findings unless the record does not support them or, after reviewing the record, "we are left with the definite and firm conviction that a mistake has been made." *Id.* (quoting *United States v. Easterling*, 921 F.2d 1073, 1077 (10th Cir.1990), *cert. denied*, 500 U.S. 937, 111 S.Ct. 2066, 114 L.Ed.2d 470 (1991)).

## A

■■■ The court found that Pappert's criminal activity caused a total loss of $5,528,-413.31. Based on this amount of loss, it added 14 to his base offense level pursuant to USSG § 2F1.1(b)(1)(O). Calculation of loss is determined for sentencing with reference to USSG § 1B1.3, and may include all relevant conduct by the defendant creating loss. *United States v. Sapp*, 53 F.3d 1100, 1104 (10th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 796, 133 L.Ed.2d 744 (1996).

Pappert challenges the amount of loss calculation. First, he argues that the figure does not properly represent the loss caused by his conduct. The guidelines suggest that any assets pledged to secure the loan should be deducted from the total amount of loss. USSG § 2F1.1, comment. (n.7(b)). In several instances, victims of Pappert's activity retained the copier machines that were the subject of the leases, and the court apparently did not deduct the value of the machines from its total loss calculation. In response,

the government raises factual questions about whether the victims were left with collateral of any real value. Specifically, the government points out that evidence was offered indicating that: (1) sometimes, used machines were represented to be new; (2) some machines were pledged as collateral on multiple leases; and (3) in at least one case, by the time the financing source considered repossession, the machinery had depreciated to the point where repossessing it would have cost more than the machine was worth.

Regarding valuation of loss, § 2F1.1 refers sentencing courts to § 2B1.1, which instructs that "loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." USSG § 2F1.1, comment. (n.7); § 2B1.1 comment. (n.3). Although loss should be reduced by the amount the victim has recovered or expects to recover, USSG § 2F1.1, comment. (n.7(a)), the government raised legitimate questions concerning the value of any such offset in this case. The district court's loss calculation represents a reasonable resolution of these thorny factual issues, and we therefore affirm.

■■■ Next, Pappert asserts that the district court erred in failing to subtract from the loss figure approximately one million dollars, which he paid back to two financing sources, Central National Bank ("CNB") and Master Lease. Pappert argues that the debts were overdue as a result of genuine financial difficulties, unconnected to the course of conduct for which he was convicted, and almost entirely paid off before his arrest.

■■■ We disagree that Pappert's overdue debts with CNB and Master Lease are not "relevant conduct" for sentencing purposes. The guidelines state that the offense level may be determined on the basis of conduct that is "part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2). The "same course of conduct" means that the defendant repeated the same type of activity over time. The focus is on "whether defendant has engaged in an identifiable behavior pattern of specified criminal activity." *Unit-*

*ed States v. Roederer,* 11 F.3d 973, 979 (10th Cir.1993) (quotations omitted).

Pappert appears to have perpetrated the same fraudulent acts against CNB and Master Lease as against other financing sources. His actions fit a clearly identifiable pattern: he went from one financing source to the next after using up his credit with each. This behavior was part of a single course of conduct. *See id.*

■ We also reject the appellant's claim that the money he repaid CNB and Master Lease under settlement agreements should have been deducted from the amount of loss. "Loss" is defined by the guidelines as "the value of the property taken, damaged, or destroyed." USSG § 2B1.1, comment. (n.2). We have taken this to mean the "net value, not the gross value, of what was taken." *United States v. Gennuso,* 967 F.2d 1460,. 1462 (10th Cir.1992) (quoting *United States v. Smith,* 951 F.2d 1164, 1167 (10th Cir. 1991)). The cases in which we have noted this distinction have calculated net loss by subtracting the value of what was given to the victim(s) *during the course of the transaction* from the value of what was fraudulently taken. *See, e.g., Smith,* 951 F.2d at 1167 (subtracting security interest given in exchange for fraudulently attained loans); *Gennuso,* 967 F.2d·at 1462 (subtracting value received from amount victim paid in a fraudulent marketing scheme); *United States v. Reddeck,* 22 F.3d 1504, 1513 (10th Cir.1994) (remanding to district court to subtract value, if any, of education from tuition paid, where students were fraudulently informed about accreditation of university). We have not required sentencing courts to deduct money subsequently returned to victims when calculating amount of loss. *United States v. Kunzman,* 54 F.3d 1522, 1532 (10th Cir.1995).

Here, the court found that Pappert repaid money he owed his creditors only "after [he]

was caught in his criminal conduct." Presentence Report at ¶ 71. Were we to hold that it was erroneous for the court to sentence him based on reimbursed losses, we would enable defendants to buy a sentence reduction after being caught. The guidelines do not authorize such a principle, and we reject it. We do not allow defendants to barter prison time in exchange for restitution.[3]

**B**

■ Pappert also claims that the district court erred in enhancing his sentence based on his abuse of a position of public or private trust under USSG § 3B1.3. He asserts that his dealings were arms-length commercial transactions that did not place him in a position of trust; and that even if he were considered to be in such a position, it did not make detection of his criminal activity more difficult. Whether a defendant occupied a position of trust is a factual question that we review for clear error. *United States v. Queen,* 4 F.3d 925, 928 (10th Cir.1993), *cert. denied,* 510 U.S. 1182, 114 S.Ct. 1230, 127 L.Ed.2d 575 (1994).

The guidelines provide the following commentary:

"Public or private trust" refers to a position ... characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference) ... For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.,* by making the detection of the offense or the defendant's responsibility for the offense more difficult).

*Id.,* comment. (n. 1).

As detailed in *United States v. Koehn,* 74 F.3d 199 (10th Cir.1996), we have applied § 3B1.3 in two categories of cases: (1) where

---

**3.** Pappert relies on *United States v. Gallegos,* 975 F.2d 710 (10th Cir.1992) for his assertion that the amounts repaid to his creditors should be subtracted from the loss total. *Gallegos* does not support this position because the bank in· that case recovered some of its loss from third parties, not the defendant. *Id.* at 712. Moreover, we remanded only so that the district court could

clarify whether it was utilizing an actual or intended loss standard. *Id.* at 713; *see also* USSG § 2F1.1, comment. (n.7(b)) (courts must use intended loss when it is greater than actual loss). We did not hold that the guidelines require deduction of monies actually returned to the victims.

employees abuse their position within their own organization to take advantage of the employer, and (2) where someone uses a "fiduciary or personal trust relationship" to perpetrate the charged offense against the beneficiary of the trust. *Id.* at 201 (quoting *United States v. Brunson*, 54 F.3d 673, 677 (10th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 397, 133 L.Ed.2d 317 (1995)). With respect to the latter category, there is not a bright line between formal or informal fiduciary relationships, and run-of-the-mill commercial relationships. "[W]e must carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." *Id.*

■ This case does not involve a formal fiduciary relationship—Pappert was neither an attorney, an accountant or any other formal trustee—but rather presents a situation in which the defendant created sufficient indicia of a position of trust that he should be treated as if he did occupy such a position. *Queen*, 4 F.3d at 929 n. 3. In isolation, each one of his lease agreements might appear to be a standard commercial transaction, executed at arm's length. However, when Pappert's acts are considered in the aggregate, it appears that he created a position of trust. Each time he offered to replace a customer's equipment, he signed them to a new lease and convinced them that he would "pay off" their obligation on the prior lease(s). He often left customers liable on several leases simultaneously. Meanwhile, he made enough payments to keep the financing sources from catching on—a realization which would not have satisfied at least some of the banks, because school districts (and not copier salesmen) were considered good credit risks. Because the banks remained ignorant, they did not notify the customers of their multiple liability. In this manner, by virtue of his

role as the middleman between customer and financing source, he gained a position of trust with respect to the customers that enabled him to conceal his fraud for long periods of time.[4]

### C

■ Pappert also received an enhancement of his sentence based on § 2F1.1(b)(6), which increases the offense level by four if the offense:

> (A) substantially jeopardized the safety and soundness of a financial institution; or
>
> (B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense.

USSG § 2F1.1(b)(6). The district court found that Pappert's conduct satisfied both (A) and (B).

■ Pappert claims that the record does not contain sufficient evidence to support a finding that his conduct satisfied (b)(6)(A). Although we reverse Pappert's § 1014 convictions, "relevant conduct" for the purposes of sentencing includes conduct for which the defendant was not convicted, as long as such conduct is proven by a preponderance of the evidence. *Sapp*, 53 F.3d at 1104. The guidelines explain that USSG § 2F1.1(b)(6)(A) is satisfied when, "as a consequence of the offense, the institution became insolvent ... or was placed in substantial jeopardy" of becoming insolvent. USSG § 2F1.1, comment. (n. 15). Here, defendant sold two forged leases, through a broker, to Superior National Bank ("SNB"). The supposed lessors, knowing nothing about the leases, refused payment. In addition, Pappert submitted ten other leases, several of which also went unpaid by the lessors. Regarding these, Pappert led the customers to think that he was assuming their debt; because he did not inform the bank that he was taking over payments, the bank was unaware that he did so.

---

4. Defendant rightly points out that the sentencing court's finding that Pappert used his "special skills" to perpetrate the fraud in this case is incorrect. Section 3B1.3 also provides for enhancement if the defendant used a "special skill" requiring "substantial education, training or licensing," USSG § 3B1.3, but the "position of trust" is an entirely distinct grounds for adjusting the sentence. The court found that Pappert created a position of trust in the course of his dealings with his clients, which enabled him to commit difficult to detect wrongs, and on these grounds we affirm.

A preponderance of the evidence supports finding that as a consequence of the forged leases and the leases Pappert had secretly taken over from his customers, the bank lost $578,556.23. The vice-president of SNB testified that the bank's closing was an "effect" of the losses, and that the losses were a "contributing factor" of the closing. Based on the amount of loss, Pappert's role in the loss, the bank's closing, and the bank official's testimony that the losses contributed to the closing, we conclude that the district court correctly enhanced Pappert's sentence under (b)(6)(A).[5]

## D

Finally, Pappert challenges the district court's restitution order. He claims that because the district court's calculations of loss were incorrect, and because the restitution order was based on these calculations, the restitution total was also incorrect. Because we approve of both the district court's loss calculations, and the court's determination of restitution based on the loss totals listed in Government Exhibit 138, we conclude Pappert's argument is meritless.

## V

Pappert's mail and wire fraud convictions are AFFIRMED. We REVERSE Pappert's convictions for violations of 18 U.S.C. § 1014. The case is REMANDED for proceedings consistent with this opinion.