**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 28 1997**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOHN J. PAPPERT,

      Defendant - Appellant.

No. 95-3071

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 94-20016-01)**

---

Tanya J. Treadway, Assistant United States Attorney (Randall K. Rathbun, United States Attorney, with her on the brief), Kansas City, Kansas, for Plaintiff-Appellee.

Daniel E. Monnat, Wichita, Kansas, for Defendant-Appellant.

---

Before **TACHA**, **COFFIN**,[*] and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

[*]    The Honorable Frank M. Coffin, Senior Circuit Judge for the United States Court of Appeals for the First Circuit, sitting by designation.

Defendant-appellant John J. Pappert, principal in an office equipment business, appeals from his conviction for three counts of mail fraud, four counts of wire fraud, and two counts of submitting false documents to a federally insured financial institution. See 18 U.S.C. §§ 1341, 1343, 1014. Pappert challenges (1) the district court's rulings on jury instructions involving good faith and materiality; (2) the sufficiency of the evidence of intent to commit fraud, use of the United States mails, and knowledge of submission of false documents to a federal bank; and (3) several sentence enhancements. Our jurisdiction arises under 28 U.S.C. § 1291 and Fed. R. App. P. 4(b). We affirm.[1]

Pappert was the president and majority shareholder of Century Office Products, Incorporated ("COPI"), a business that leased, sold, and serviced photocopier machines and other office equipment from its inception in 1980 until its demise in 1993. Pappert managed the finances and day-to-day operations of COPI, and was in charge of leasing.

COPI's leasing operation worked as follows: a representative of the company would initiate a leasing agreement with a customer, and Pappert would usually close the deal. Many of these customers were schools and school

---

[1] This panel previously issued a published opinion in this case, United States v. Pappert, 104 F.3d 1559 (10th Cir. 1997), but stayed the mandate pending the Supreme Court's decision in United States v. Wells, No. 95-1228. That decision has now been issued. See United States v. Wells, 117 S. Ct. 921 (1997). Based on the Wells decision, we now vacate our previous opinion.

districts. Pappert sold most leases to banks or other financing sources, sometimes through a lease broker. These financing sources would pay COPI in exchange for the rights to income from the lease and to the equipment itself. If the transaction took place through a broker, the broker would pay COPI and execute a second assignment to the financing source.

COPI's practice of assigning leases was a key issue at trial. Each lease agreement contained a provision allowing COPI to assign the lease to third parties, and permitting reassignment. COPI was not obligated to notify customers of assignments, and Pappert often did not do so. In some instances, he would tell customers that he would not sell their lease, then would proceed to do so. Although Pappert claims that customers were given the choice to pay either COPI or the financing source, some customers testified that they were simply told to pay COPI and never learned that their leases had been assigned.

Periodically, Pappert would offer to replace his customers' old machines with new equipment. He convinced the customers that he would "pay off" the old leases if the customer would take out new leases on better, more up-to-date equipment. If a customer agreed to enter into a new lease, Pappert would substitute the new equipment for the old. However, his practice was to take over the installments without paying off in full the old lease. It was in this fashion that customers unwittingly became liable on multiple leases.

Pappert also misled lending institutions by replacing equipment and taking over the customers' payments on their old leases without informing the lenders. Many creditors thought that the original equipment was still in place and the customers were still making payments. Representatives of the financial institutions testified that if they had known of Pappert's repossession, they would have at least reevaluated the creditworthiness of the transaction. Most indicated that they would not have accepted the new arrangement because COPI did not have the good credit of its school district customers.

Ultimately, Pappert's operation began to implode. As he fell behind on more and more payments, several financing institutions began to call in Pappert's debt. This led him to submit forged leases through his lease broker to another bank, Superior National Bank, in an attempt to bring in cash. When that bank notified the lessees of their delinquency, the lessees discovered Pappert's ruse.

Nonpayment on the customers' many leases eventually led the financing sources to seek payment directly from the lessees. A slew of lawsuits ensued. The government tells us that 39 entities lost over $5.5 million, and Superior National Bank was put into receivership as a result of Pappert's conduct.

II

Pappert makes two arguments challenging the trial court's jury instructions. "The appropriate standard of review for challenges to jury instructions is whether

the jury, considering the instructions as a whole, was misled." United States v. Smith, 13 F.3d 1421, 1424 (10th Cir.), cert. denied, 115 S. Ct. 209 (1994). Only where the reviewing court has "substantial doubt that the jury was fairly guided" will the judgment be disturbed. Id. (quoting United States v. Mullins, 4 F.3d 898, 900 (10th Cir. 1993)). We review de novo to determine the propriety of a jury instruction to which objection was made at trial, and for plain error where no objection was made. Id.

A

Pappert first contends that the court was wrong to instruct the jury that "it is no defense to a charge of mail fraud or wire fraud that the defendant honestly believed in the ultimate success of his business," Appellant's Partial App. at 53 (Instruction No. 22), while failing to instruct it that "good faith" in one's representations is a defense. At trial, the court overruled Pappert's request that the court give "the good faith instruction as I commented in chambers." Tr. at 748. No record is available of the conference in chambers. Pappert did not object to the inclusion of the "honest belief" instruction.

Applying de novo review, we conclude that the lack of an instruction on good faith, considered in light of the entire set of instructions, was not misleading. Although Pappert insists that the good faith instruction was essential to his defense, a defendant is not entitled to such an instruction without a

reasonable factual predicate. United States v. Grissom, 44 F.3d 1507, 1512 (10th Cir.), cert. denied, 115 S. Ct. 1720 (1995).

There is sufficient factual support for this defense "when the jury could reasonably find . . . that the defendant in good faith believed that the plan would succeed, that the promises made would be kept and the representations carried out." United States v. Hopkins, 744 F.2d 716, 718 (10th Cir. 1984) (en banc). The record indicates that Pappert misled customers to think that he would pay off the loans in their entirety, sometimes sending written guarantees that loans would be paid off by a certain date, and on at least one occasion sending a copy of a check with which he falsely claimed a customer's loan had been paid off. In addition, he submitted falsified leases to financing sources. Finally, Pappert admitted to improprieties when called to task on his overdue debts, once referring to his own conduct as a "scam." In light of this record, we find that the jury could not reasonably have found that the defendant believed his own promises in good faith. Because there was not adequate factual support for the good faith defense, the district court properly refused to give a "good faith" instruction.

Because objection was not made to the "honest belief" instruction at trial, we review the district court's instruction for plain error. Smith, 13 F.3d at 1424. "Plain error, in this context, is error that affects the defendant's right to a fair and impartial trial." Id. The court, in its instruction, accurately stated the law.

United States v. Reddeck, 22 F.3d 1504, 1507 (10th Cir. 1994) ("'[E]ven though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations.'" (quoting United States v. Themy, 624 F.2d 963, 965 (10th Cir. 1980))).  The evidence supported giving such an instruction.  Therefore, the district court did not commit plain error.

B

Pappert next asserts that the court erred in instructing the jury on the offense of submitting false documents to a federally insured financial institution.  The court properly instructed the jury that materiality was an element of the offense, but added:

> You are further instructed that whether the statement was material is a question for the Court, and that the Court has determined that the statements in question were material as a matter of law.

Appellant's App. at 55-56 (Instruction No. 24).  Although Pappert did not object to this instruction at trial and never contested the materiality of the relevant statements, he claims that the court's failure to submit the element of materiality to the jury was plain error, reversible under United States v. Gaudin, 115 S. Ct. 2310 (1995), decided after this case was tried.

The first question before us is whether the district court erred.  See United States v. Olano, 507 U.S. 725, 732-33 (1993).  Although this circuit, like many others, treated materiality as an element of § 1014, United States v. Smith, 838

-7-

F.2d 436, 439 (10th Cir. 1988), the Supreme Court has recently decided that materiality of a falsehood is not an element of a § 1014 offense, United States v. Wells, 117 S. Ct. 921, 926-31 (1997).  Because the § 1014 offense does not require the materiality of a statement, the jury's failure to be instructed on it or to decide it was not error.  Hence, the basis on which Pappert asserts error under Gaudin has been negated.  See United States v. Copus, 95-6034, slip op. at 9 (10th Cir. Apr. 23, 1997).

### III

The district court denied Pappert's motions for judgment of acquittal on grounds of insufficient evidence.  Pappert challenges this determination on a number of grounds.  In reviewing the district court's determination, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); U.S. v. Harrod, 981 F.2d 1171, 1174 (10th Cir. 1992).  In answering this question, "we may neither weigh conflicting evidence nor consider the credibility of witnesses."  Harrod, 981 F.2d at 1175 (quoting U.S. v. Darrell, 828 F.2d 644, 647 (10th Cir. 1987)).  Applying this standard, we affirm the denial of defendant's motions.

A

Pappert challenges the sufficiency of the evidence underlying his fraud convictions on two grounds. First, he claims that the prosecution failed to prove intent, because it was evident that he made his communications in good faith. He contends that his payment of installments on some of the leases that he took over, promising to "pay off," evinces this good faith. Additionally, Pappert contends that his "willingness and repeated attempts to work with his financing sources to correct the financial messes he had created" also suggests good faith.

In the previous part, we affirmed the district court's decision not to give a good faith jury instruction, because we found no reasonable factual predicate for a good faith finding. For the same reason, we reject Pappert's challenge to the sufficiency of evidence regarding his fraudulent intent. We find that the evidence regarding Pappert's misrepresentations supports the jury's finding on this matter.

B

With respect to his mail fraud convictions, Pappert claims that the evidence failed to show the United States mails were used. For each of the three counts of mail fraud, witnesses testified that they received Pappert's letters via the United States mail. In addition, the jury saw the documents in question, which were folded in thirds as if sent in a standard envelope, and heard testimony on Pappert's normal course of business with respect to transmitting letters. Although

the defendant suggests the evidence is conflicting and incredible, such assessments lie within the province of the jury. Viewing the evidence most favorably to the prosecution, we find it sufficient to convince a rational jury beyond a reasonable doubt that the letters were sent via United States mail.

IV

Pappert claims that the district court erred in enhancing his sentence under various sentencing guidelines. Pappert was sentenced to 60 months for his conviction on the first count of the indictment, and to 97 months on each of the eight other counts of which he was convicted. The sentences for the counts were to run concurrently. We review the district court's interpretation and application of the sentencing guidelines de novo. United States v. McAlpine, 32 F.3d 484, 487-88 (10th Cir.), cert. denied, 115 S. Ct. 610 (1994). We review the court's underlying findings of fact for clear error. Id. at 488. We will accept these factual findings unless the record does not support them or, after reviewing the record, "we are left with the definite and firm conviction that a mistake has been made." Id. (quoting United States v. Easterling, 921 F.2d 1073, 1077 (10th Cir. 1990).

A

The court found that Pappert's criminal activity caused a total loss of $5,528,413.31. Based on this amount of loss, it added 14 to his base offense level

pursuant to USSG § 2F1.1(b)(1)(O). Calculation of loss is determined for sentencing with reference to USSG § 1B1.3, and may include all relevant conduct by the defendant creating loss. United States v. Sapp, 53 F.3d 1100, 1104 (10th Cir. 1995), cert. denied, 116 S. Ct. 796 (1996).

Pappert challenges the amount of loss calculation. First, he argues that the figure does not properly represent the loss caused by his conduct. The guidelines suggest that any assets pledged to secure the loan should be deducted from the total amount of loss. USSG § 2F1.1, comment. (n.7(b)). In several instances, victims of Pappert's activity retained the copier machines that were the subject of the leases, and the court apparently did not deduct the value of the machines from its total loss calculation. In response, the government raises factual questions about whether the victims were left with collateral of any real value. Specifically, the government points out that evidence was offered indicating: (1) sometimes, used machines were represented to be new; (2) some machines were pledged as collateral on multiple leases; and (3) in at least one case, by the time the financing source considered repossession, the machinery had depreciated to the point where repossessing it would have cost more than the machine was worth.

Regarding valuation of loss, § 2F1.1 refers sentencing courts to § 2B1.1, which instructs that "loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information."

USSG § 2F1.1, comment. (n.7); § 2B1.1 comment. (n.3). Although loss should be reduced by the amount the victim has recovered or expects to recover, USSG § 2F1.1, comment. (n.7(a)), the government raised legitimate questions concerning the value of any such offset in this case. The district court's loss calculation represents a reasonable resolution of these thorny factual issues, and we therefore affirm.

Next, Pappert asserts that the district court erred in failing to subtract from the loss figure approximately one million dollars, which he paid back to two financing sources, Central National Bank ("CNB") and Master Lease. Pappert argues that the debts were overdue as a result of genuine financial difficulties, unconnected to the course of conduct for which he was convicted, and almost entirely paid off before his arrest.

We disagree that Pappert's overdue debts with CNB and Master Lease are not "relevant conduct" for sentencing purposes. The guidelines state that the offense level may be determined on the basis of conduct that is "part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2). The "same course of conduct" means that the defendant repeated the same type of activity over time. The focus is on "whether defendant has engaged in an identifiable behavior pattern of specified criminal activity." United States v. Roederer, 11 F.3d 973, 979 (10th Cir. 1993) (quotations omitted).

Pappert appears to have perpetrated the same fraudulent acts against CNB and Master Lease as against other financing sources. His actions fit a clearly identifiable pattern: he went from one financing source to the next after using up his credit with each. This behavior was part of a single course of conduct. See id.

We also reject the appellant's claim that the money he repaid CNB and Master Lease under settlement agreements should have been deducted from the amount of loss. "Loss" is defined by the guidelines as "the value of the property taken, damaged, or destroyed." USSG § 2B1.1, comment. (n.2). We have taken this to mean the "net value, not the gross value, of what was taken." United States v. Gennuso, 967 F.2d 1460, 1462 (10th Cir. 1992) (quoting United States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991)). The cases in which we have noted this distinction have calculated net loss by subtracting the value of what was given to the victim(s) during the course of the transaction from the value of what was fraudulently taken. See, e.g., Smith, 951 F.2d at 1167 (subtracting security interest given in exchange for fraudulently attained loans); Gennuso, 967 F.2d at 1462 (subtracting value received from amount victim paid in a fraudulent marketing scheme); United States v. Reddeck, 22 F.3d 1504, 1513 (10th Cir. 1994) (remanding to district court to subtract value, if any, of education from tuition paid, where students were fraudulently informed about accreditation of

university).  We have not required sentencing courts to deduct money subsequently returned to victims when calculating amount of loss.  United States v. Kunzman, 54 F.3d 1522, 1532 (10th Cir. 1995).

Here, the court found that Pappert repaid money he owed his creditors only "after [he] was caught in his criminal conduct."  Presentence Report at ¶ 71.  Were we to hold that it was erroneous for the court to sentence him based on reimbursed losses, we would enable defendants to buy a sentence reduction after being caught.  The guidelines do not authorize such a principle, and we reject it.  We do not allow defendants to barter prison time in exchange for restitution.[2]

B

Pappert also claims that the district court erred in enhancing his sentence based on his abuse of a position of public or private trust under USSG § 3B1.3.  He asserts that his dealings were arms-length commercial transactions that did not place him in a position of trust; and that even if he were considered to be in such a position, it did not make detection of his criminal activity more difficult.

---

[2]     Pappert relies on United States v. Gallegos, 975 F.2d. 710 (10th Cir. 1992) for his assertion that the amounts repaid to his creditors should be subtracted from the loss total.  Gallegos does not support this position because the bank in that case recovered some of its loss from third parties, not the defendant.  Id. at 712.  Moreover, we remanded only so that the district court could clarify whether it was utilizing an actual or intended loss standard.  Id. at 713; see also USSG § 2F1.1, comment. (n.7(b)) (courts must use intended loss when it is greater than actual loss).  We did not hold that the guidelines require deduction of monies actually returned to the victims.

-14-

Whether a defendant occupied a position of trust is a factual question that we review for clear error. United States v. Queen, 4 F.3d 925, 928 (10th Cir. 1993), cert. denied, 114 S. Ct. 1230 (1994).

The guidelines provide the following commentary:

"Public or private trust" refers to a position . . . characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). . . . For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

Id., comment. (n.1).

As detailed in United States v. Koehn, 74 F.3d 199 (10th Cir. 1996), we have applied § 3B1.3 in two categories of cases: (1) where employees abuse their position within their own organization to take advantage of the employer, and (2) where someone uses a "fiduciary or personal trust relationship" to perpetrate the charged offense against the beneficiary of the trust. Id. at 201 (quoting United States v. Brunson, 54 F.3d 673, 677 (10th Cir.), cert. denied, 116 S. Ct. 397 (1995)). With respect to the latter category, there is not a bright line between formal or informal fiduciary relationships, and run-of-the-mill commercial relationships. "[W]e must carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or

-15-

the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." Id.

This case does not involve a formal fiduciary relationship--Pappert was neither an attorney, an accountant or any other formal trustee--but rather presents a situation in which the defendant created sufficient indicia of a position of trust that he should be treated as if he did occupy such a position. Queen, 4 F.3d at 929 n.3. In isolation, each one of his lease agreements might appear to be a standard commercial transaction, executed at arm's length. However, when Pappert's acts are considered in the aggregate, it appears that he created a position of trust. Each time he offered to replace a customer's equipment, he signed them to a new lease and convinced them that he would "pay off" their obligation on the prior lease(s). He often left customers liable on several leases simultaneously. Meanwhile, he made enough payments to keep the financing sources from catching on--a realization which would not have satisfied at least some of the banks, because school districts (and not copier salesmen) were considered good credit risks. Because the banks remained ignorant, they did not notify the customers of their multiple liability. In this manner, by virtue of his role as the middleman between customer and financing source, he gained a

position of trust with respect to the customers that enabled him to conceal his fraud for long periods of time.[3]

C

Pappert also received an enhancement of his sentence based on § 2F1.1(b)(6), which increases the offense level by four if the offense:

(A)  substantially jeopardized the safety and soundness of a financial institution; or

(B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense.

USSG § 2F1.1(b)(6).  The district court found that Pappert's conduct satisfied both (A) and (B).

Pappert claims that the record does not contain sufficient evidence to support a finding that his conduct satisfied (b)(6)(A).  "Relevant conduct" for the purposes of sentencing includes conduct for which the defendant was not convicted, as long as such conduct is proven by a preponderance of the evidence. Sapp, 53 F.3d at 1104.  The guidelines explain that USSG § 2F1.1(b)(6)(A) is

_____

[3]      Defendant rightly points out that the sentencing court's finding that Pappert used his "special skills" to perpetrate the fraud in this case is incorrect.  Section 3B1.3 also provides for enhancement if the defendant used a "special skill" requiring "substantial education, training or licensing," USSG § 3B1.3, but the "position of trust" is an entirely distinct ground for adjusting the sentence.  The court found that Pappert created a position of trust in the course of his dealings with his clients, which enabled him to commit difficult to detect wrongs, and on these grounds we affirm.

satisfied when, "as a consequence of the offense, the institution became insolvent . . . or was placed in substantial jeopardy" of becoming insolvent. USSG § 2F1.1, comment. (n.15). Here, defendant sold two forged leases, through a broker, to Superior National Bank ("SNB"). The supposed lessees, knowing nothing about the leases, refused payment. In addition, Pappert submitted ten other leases, several of which also went unpaid by the lessees. Regarding these, Pappert led the customers to think that he was assuming their debt; because he did not inform the bank that he was taking over payments, the bank was unaware that he did so.

A preponderance of the evidence supports finding that as a consequence of the forged leases and the leases Pappert had secretly taken over from his customers, the bank lost $578,556.23. The vice-president of SNB testified that the bank's closing was an "effect" of the losses, and that the losses were a "contributing factor" of the closing. Based on the amount of loss, Pappert's role in the loss, the bank's closing, and the bank official's testimony that the losses contributed to the closing, we conclude that the district court correctly enhanced Pappert's sentence under (b)(6)(A).[4]

---

[4]     The parties also dispute whether (b)(6)(B) was satisfied. Section 2F1.1 is disjunctive; because (b)(6)(A) is satisfied we need not address (b)(6)(B).

D

Finally, Pappert challenges the district court's restitution order. He claims that because the district court's calculations of loss were incorrect, and because the restitution order was based on these calculations, the restitution total was also incorrect. Because we approve of both the district court's loss calculations, and the court's determination of restitution based on the loss totals listed in Government Exhibit 138, we conclude Pappert's argument is meritless.

V

The district court's judgment is AFFIRMED.