**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 25 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

JOSE DIAZ-ZAPPATTA and ULISES
RAMOS-FERNANDEZ,

　　　　Defendants - Appellants.

Nos. 96-2256
and 96-2259

(D. New Mexico)

(D.C. No. CR-95-430-LH)

---

**ORDER AND JUDGMENT**[*]

---

Before **ANDERSON**, **TACHA**, and **BALDOCK**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore
ordered submitted without oral argument.

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

Codefendants Ulises Ramos-Fernandez and Jose Diaz-Zappatta appeal from their convictions following a jury trial.[1] Both Ramos-Fernandez and Diaz-Zappatta were convicted on one count of conspiracy to possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846, and on one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1). Additionally, Diaz-Zappatta was convicted on a second count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), and on two counts of carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). On appeal, Ramos-Fernandez contends that the evidence was insufficient to support his conviction for conspiracy. Diaz-Zappatta contends that the evidence was insufficient to support his convictions for carrying a firearm during a drug trafficking crime. We affirm the convictions of both defendants.

**BACKGROUND**

Based on information that unnamed persons were dealing crack cocaine out of an apartment located at 436 Louisiana S.E., Apt. 15, Albuquerque, New Mexico ("apartment 15"), Albuquerque police obtained and executed a search

---

[1]Because these two appeals involve the same underlying facts and testimony, we have companioned them for our consideration.

warrant for that address on June 29, 1995.  When they arrived, the apartment door was open.  Identifying themselves, the officers entered and immediately saw four men who were sitting on sofas in the living room.  The officers ordered the men to stand up.  According to the officers' trial testimony, when defendant Jose Diaz-Zappatta stood up, there was a loaded handgun on top of the sofa cushion exactly where he had been sitting.  Although the gun had been hidden by Diaz-Zappatta's body while he sat, once he stood, it was plainly visible.[2]  R. Vol. III at 76-77, 79-80, 83, 98, 143.  Detective Sallee, who was recognized as an expert in the area of narcotics investigations, testified that a person would carry a weapon in the vicinity of a drug transaction to protect the drug deal.  Id. at 83.  According to Sallee, "it's very common for one of the individuals involved in the deal to bring a weapon for protection of either his money or his drugs."  Id.  Sallee further

---

[2]Officer Sallee testified as follows regarding the handgun:

A:      When I had Mr. Diaz stand up, I immediately noticed that there was a handgun right under where he was seated.
Q:      Now, what do you mean by under?
A:      He was sitting on top of it.  It was on top of the cushion of the couch, and he was directly on top of the hand gun.
Q:      So was his body, when he stood up and before he stood up, in direct physical contact or contact with this weapon?
A:      Yes, it was.
Q:      There was no cushion, no pillow, anything?
A:      There was nothing in between him and the gun.

R. Vol. III at 76-77.

testified that only Diaz-Zappatta had access to the gun. Id. "No one could get [the handgun] but Mr. Diaz because he was seated directly on top of it." Id.

As the living room occupants were being secured, two officers entered the back bedroom, where they encountered Ramos-Fernandez and Lorenzo Hernandez. The first officer observed Hernandez drop a bag containing crack cocaine, and he also observed a large amount of money on the bed. Id. 164-65, 86. During the ensuing search, the officers took pagers from both Ramos-Fernandez and Hernandez, and they found an envelope addressed to Ramos-Fernandez at apartment 15. Id. at 121, 127, 166-67.

At that time, the officers arrested Ramos-Fernandez because he lived at the apartment and was in the back room with the drugs.[3] R. Vol. III at 90. They arrested Diaz-Zappatta because he was in charge of the firearm, and they arrested Hernandez because he was in the bedroom with the crack cocaine. See id. At a later date, Cesar Cuba-Garcia was arrested. Eventually a federal grand jury returned a superseding indictment which charged all four men with various drug

---

[3]One of the officers testified that they concluded Ramos-Fernandez lived at apartment 15 because of the envelope addressed to him at the address, and also because Ramos-Fernandez told another officer that he resided there. R. Vol. III at 105-06. Ramos-Fernandez's counsel asked questions which suggested that the testifying officer had insufficient personal information to support the conclusion that Ramos-Fernandez lived at apartment 15, but he made no hearsay objection.

crimes,[4] and which also charged Diaz-Zappatta with carrying a firearm during and in relation to drug trafficking crimes.  R. Vol. I, Tab 60.

Hernandez entered into a plea agreement.  At trial, Hernandez testified that he began dealing drugs in February 1995.  R. Vol. III at 184-86.  His first contact was with Diaz-Zappatta and Cuba-Garcia, and thereafter, he generally purchased the drugs from Diaz-Zappatta.  Id. at 185-86, 190.  However, when Diaz-Zappatta was not available, Hernandez also purchased from Ramos-Fernandez on two or three occasions and from Cuba-Garcia on two or three occasions.  Id. at 192.  Responding to a specific question about where his purchases from Ramos-Fernandez took place, Hernandez answered, "There at his house," in apparent reference to apartment 15.  Id. at 222.

According to Hernandez, Diaz-Zappatta, Ramos-Fernandez, and Cuba-Garcia were dealing drugs together at apartment 15, id. at 191-92, and they would talk about "the rocks, the money, and the drugs."  Id. at 201.  Although Diaz-Zappatta appeared to be the one in charge, it was Ramos-Fernandez who would contact Hernandez by calling his pager.  Id. at 192, 194.  During the period that he was buying drugs from the codefendants, Hernandez was making about $2,000 profit a month by reselling on the street.  Id. at 195.  Generally, his transactions with his codefendants occurred in the same way as the transaction on June 29,

_____

[4]The jury acquitted Cuba-Garcia on all counts.

1995. Id. at 190, 200, 207, 240. Thus, on the day that police executed the warrant, he had gone to the apartment to buy drugs which belonged to Diaz-Zappatta and Ramos-Fernandez. Id. at 197. On entry, he had greeted Diaz-Zappatta and then gone to see Ramos-Fernandez as usual. Id. at 200. When the police arrived, Hernandez was in the process of counting out the money. Id. at 196-97.

Diaz-Zappatta also testified. Diaz-Zappatta denied any personal involvement in any drug dealing, and claimed that he was merely waiting for Ramos-Fernandez to give him a ride on the day that he was arrested. Diaz-Zappatta also denied any knowledge that a drug deal was proceeding between Ramos-Fernandez and Hernandez, and he further disputed the testimony that he had been sitting on a gun. According to Diaz-Zappatta, the police were not telling the truth when they said that there was a gun underneath him. R. Vol. IV at 369.

## DISCUSSION

Both Ramos-Fernandez and Diaz-Zappatta contend that the evidence is insufficient to support their convictions on certain counts. Whether the evidence is sufficient to support a conviction is a question of law which we review de novo. United States v. Dashney, 117 F.3d 1197, 1202 (10th Cir. 1997). Viewing

the evidence—both direct and circumstantial, together with the reasonable inferences drawn therefrom—in the light most favorable to the government, we must determine whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In answering this question, we may neither weigh conflicting evidence nor consider the credibility of witnesses'." United States v. Johnson, 120 F.3d 1107, 1108 (10th Cir. 1997) (quoting United States v. Pappert, 112 F.3d 1073, 1077 (10th Cir. 1997) (citations and internal quotations omitted)); United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir.), cert. denied, 117 S. Ct. 226 (1996).

### A. Ramos-Fernandez

Ramos-Fernandez contends that the testimony is not sufficient to establish the existence of a conspiracy during the times alleged in the conspiracy count. He complains that, except for the date of his arrest, the government presented no evidence as to the dates of his alleged involvement in any conspiracy. Thus, he argues that "it would be an impermissible stretch of credulity to believe that Hernandez's testimony must relate to the times alleged in the Indictment." Appellant's Br. at 12. We disagree.

To obtain a conviction for conspiracy, the government must prove "'[1] that two or more persons agreed to violate the law, [2] that the Defendant knew at

least the essential objectives of the conspiracy, . . . [3] that the Defendant knowingly and voluntarily became a part of it, and [4] that the alleged coconspirators were interdependent.'" United States v. Ivy, 83 F.3d 1266, 1285 (10th Cir.) (quoting United States v. Evans, 970 F.2d 663, 668 (10th Cir. 1992)), cert. denied, 117 S. Ct. 253 (1996).

In this case, the indictment charges that the conspiracy existed from at least April 1995 until September 1995. R. Vol. I, Tab 60, Count One at ¶ 1. In relation to Ramos-Fernandez, the indictment specifically charges overt acts related to the June 29, 1995, search and arrests. Id. at ¶ 3.

Clearly, Hernandez's testimony provided ample evidence from which the jury could have found the essential elements of Ramos-Fernandez's involvement in a conspiracy to violate drug laws on June 29, 1995. Moreover, taking the evidence in the light most favorable to the government, a reasonable juror could have found that Ramos-Fernandez had been engaged in similar acts over a course of months which spanned the larger period charged in the indictment.[5] Accordingly, we affirm his conviction.

---

[5]Even if this were not the case, a "variance between an indictment and the proof may be disregarded if it does not affect an essential element of the offense so as to impair substantial rights of the defendant." United States v. Smith, 838 F.2d 436, 440 n.1 (10th Cir. 1988) (citations omitted).

**B. Diaz-Zappatta**

Diaz-Zappatta does not appeal his convictions on the drug charges. Rather, he contends only that the officers' testimony that he was seated on top of the gun is insufficient to support his conviction for carrying a weapon during and in relation to a drug transaction in violation of 18 U.S.C. § 924(c)(1).

Although the Supreme Court has not specifically defined "carry" under § 924, it has given some guidance which assists our considerations. Thus, "a firearm can be carried without being used, e.g., when an offender keeps a gun hidden in his clothing throughout a drug transaction." Bailey v. United States, 116 S. Ct. 501, 507 (1995). Consistent with Bailey, to obtain a conviction under the "carry" prong of § 924(c)(1), the government must prove that the defendant possessed the firearm through dominion and control, and that he transported or moved it. United States v. Smith, 82 F.3d 1564, 1568 (10th Cir. 1996).

Clearly the officer's testimony that Diaz-Zappatta was sitting directly on top of the gun, thereby giving him ready access to it, supports a finding that he possessed the gun through dominion and control. Nonetheless, Diaz-Zappatta complains that there was no evidence linking his possession to the drug transaction. In particular, he notes that nothing in Hernandez's testimony concerned guns. The argument ignores the officer's expert testimony regarding the purposes for which drug dealers bring guns to drug transactions. The fact that

a drug transaction was occurring, in the open room immediately next to where Diaz-Zappatta sat, is sufficient to support a reasonable juror's inference that the gun was related to the drug offense. Moreover, in reviewing for sufficiency of the evidence, we "'presume a nexus between a firearm and a drug trafficking offense when an individual with ready access to a firearm is involved in such an offense.'"[6] United States v. Baker, 30 F.3d 1278, 1280 (10th Cir. 1994) (quoting United States v. Coslet, 987 F.2d 1493, 1495 (10th Cir. 1993)).

Finally, Diaz-Zappatta contends that, even if there were a gun underneath him on the sofa, there is no evidence that he carried it. Again, viewing the record in the light most favorable to the government, we note the evidence that Diaz-Zappatta was sitting directly on top of the gun. Although there is no direct evidence that Diaz-Zappatta placed the gun beneath him in a way that both hid it and made it readily accessible, the circumstantial evidence is substantial. That is, in this case, only Diaz-Zappatta had access to the gun. From that circumstance, a

---

[6]As we noted in Baker:

> The "nexus presumption" language used in our cases in no way changes the government's burden at trial to prove every element of a § 924(c)(1) offense. . . . [T]he "nexus presumption" language is merely a tool of appellate review by which this court judges whether the evidence introduced at trial, with its accompanying inferences and viewed in the light most favorable to the government, is sufficient to permit a reasonable jury to find the defendant guilty beyond a reasonable doubt.

Baker, 30 F.3d at 1280 n.1.

reasonable juror could infer that Diaz-Zappatta transported and placed the gun on the sofa, exactly where he sat.[7]

Accordingly, for the reasons stated, we AFFIRM the judgment of the district court.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

---

[7]That Diaz-Zappatta was the only person with access to, and control over, the gun readily distinguishes his case from United States v. Smith, 82 F.3d 1564 (10th Cir. 1996), which involved a handgun found on the bedroom dresser of a defendant who was convicted of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). In Smith, we rejected the government's assertion "that at some unknown time, [the defendant] moved the weapon from some unknown previous location to the dresser where it was found." Id. at 1568. Finding that there was no evidence supporting that inference, we noted that several persons had access to the firearm and the dresser. Thus, we concluded that "we can only speculate whether defendant Smith, or any one of the several other persons in the house, during and in relation to the drug trafficking offense, moved the firearms or placed them where they were found during the search." Id. By contrast, in this case, the evidence demonstrated that the gun was located in direct contact with Diaz-Zappatta's body, underneath him, where no one else could access it.