**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jack B. RACKLEY, Defendant–Appellant.**

**No. 91–6343.**

United States Court of Appeals, Tenth Circuit.

March 8, 1993.

C. Merle Gile, Oklahoma City, OK, for defendant-appellant.

Sara Criscitelli, Dept. of Justice, Washington, DC (Wayne P. Williams and Kevin G. Matthews, Attys. for Dept. of Justice, Washington, DC, and Timothy D. Leonard, U.S. Atty., Oklahoma City, OK, with her on the brief), for plaintiff-appellee.

Before BALDOCK and EBEL, Circuit Judges, and LUNGSTRUM, District Judge.*

* The Honorable John W. Lungstrum, United States District Judge for the District of Kansas, sitting by designation.

LUNGSTRUM, District Judge.

On April 17, 1991, defendant Jack B. Rackley and Mark E. Hight were charged in an eighteen-count Indictment by a grand jury in the Western District of Oklahoma. The Indictment charged defendant and Hight with thirteen counts of bank fraud in violation of 18 U.S.C. § 1344 and five counts of misapplication of bank funds in violation of 18 U.S.C. § 656. Both defendant and Hight were named in all eighteen counts of the Indictment. On June 11, 1991, Hight filed a petition to enter a plea of guilty.

Defendant's jury trial was conducted on July 8–12, 1991. Hight testified as a government witness at defendant's trial. Defendant was convicted of eight counts of bank fraud, in violation of 18 U.S.C. § 1344, and three counts of misapplication of bank funds, in violation of 18 U.S.C. § 656.[1] Defendant was sentenced to concurrent terms of two and one half years imprisonment on each count.

Defendant contends on appeal that the district court erred: (1) in finding that the government presented sufficient evidence to convict defendant on the charges of bank fraud and misapplication of funds; and (2) that the district court erred in allowing the government to cross-examine defendant and defense witness Larry Baresal regarding their removal from banking pursuant to a consent order entered into with the Office of the Comptroller of the Currency. For the reasons set forth below, we affirm the rulings of the district court.

## I. Factual Background

Defendant was President and Chairman of the Board of Directors of the First National Bank of Tipton, Oklahoma ("Tipton Bank"). He was also a director of the First State Bank of Blanchard, Oklahoma ("Blanchard Bank") and the First National Bank of Hammon, Oklahoma ("Hammon Bank"). Defendant was also president of Executive Bank Services, a computer company that provided various bank management services for the Tipton, Blanchard and Hammon Banks.

Mark Hight was a co-defendant in the criminal case. At the time of the offenses charged, Hight was a senior vice-president of the Farmer's National Bank in Cordell, Oklahoma ("Farmers Bank"). Prior to trial, Hight entered into a plea agreement wherein he pled guilty to a charge of making a false statement and agreed to testify for the Government in the criminal case against defendant.

The evidence at trial established that defendant and Hight established a business partnership named JA–MAR Properties, Ltd. ("JA–MAR")[2]. The articles of partnership of JA–MAR were signed on February 17, 1983, showing defendant and Hight as general partners. Through JA–MAR, defendant and Hight bought low to moderate income residential properties in the Oklahoma City area for rental and investment.

The evidence at trial was that during the period immediately following JA–MAR's establishment, the partnership fared well financially. Rents from the properties were sufficient to service the debt on the properties and make necessary repairs. However, in the economic downturn of late 1986, JA–MAR ran into severe cash flow problems. JA–MAR's vacancy rate was increasing while its rental income was falling. Defendant and Hight were forced to make some of the mortgage payments and repairs out of their own funds. By 1986, JA–MAR had incurred approximately $500,000 of secured and unsecured debt, for which defendant and Hight were both fully responsible.

In an effort to alleviate these financial pressures, defendant and Hight engaged in an arrangement to sell several pieces of property. Defendant and Hight approached Bruce Thompson, a local real estate investor who bought, renovated, and

---

1. Defendant was acquitted on five counts of bank fraud and two counts of misapplication of bank funds.

2. JA–MAR was short for the first names of defendant Jack B. Rackley and Mark Hight.

rented low and moderate income real estate properties in the Oklahoma City, area. Thompson also served as a "work out specialist" for several area banks, including Farmers Bank. Thompson would buy foreclosed properties from the banks, with their funding and at their request, in order to remove the nonproductive properties from the bank's books. Thompson did not purchase all these properties himself. Instead, "investors" with good credit ratings took out the loans in their names. Thompson would pay these investors a $2500 incentive fee for each loan.[3] Thompson would then make all the payments on these loans until such time as the investment property had been repaired, rented and was producing sufficient income to service the debt.

In late fall, 1986, Hight approached Thompson regarding several troubled JA–MAR properties. Thompson found two potential investors for JA–MAR. Those investors were Thompson's attorney, Edward Allen Reed, and former real estate developer Rick Garrett. JA–MAR proceeded to sell multiple properties to Reed and Garrett. The properties were financed primarily through banks in which defendant and Hight were employed. A series of loans were made by Farmers Bank, Hammon Bank, Blanchard Bank, Tipton Bank and the Oxford Bank of Oxford, Kansas.[4] At trial, the Government alleged that the vast majority of these loans were made with either defendant or Hight acting as the loan officer at the bank. The Government alleged that various false statements were made in order to obtain the loans, including lack of disclosure of defendant's and Hight's financial interest in JA–MAR, signed settlement statements representing that purchasers had made earnest money deposits which in fact had not been made, and preparation of misleading credit information regarding the purchasers. The Government also alleged that loan documents were structured to represent that the investors were paying 90% of the appraised value, when in fact the banks were financing 100% of the purchase price.

In addition to the counts involving improper loans to finance purchases of JA–MAR properties, counts 12 and 13 of the Indictment related to a loan made by the Tipton Bank for Reed's purchase of an eight-unit apartment building owned by Thompson. Defendant acted as the loan officer on the deal, providing the financing through a loan for the full amount made by the Tipton Bank. The Government alleges that some of the proceeds from this loan were used to pay commissions to Reed and Garrett for the other JA–MAR loans and to pay for repairs to the JA–MAR properties.

## II. Sufficiency of the Evidence

■ Evidence is sufficient to support a criminal conviction if, viewing all the evidence, both direct and circumstantial, in the light most favorable to the government, a reasonable trier of fact could find the essential elements of a crime beyond a reasonable doubt. *United States v. Drake*, 932 F.2d 861, 863 (10th Cir.1991); *United States v. Culpepper*, 834 F.2d 879, 881 (10th Cir.1987).

■ In order to convict the defendant of bank fraud under 18 U.S.C. § 1344, the government was required to prove: (1) that the defendant knowingly executed or attempted to execute a scheme (i) to defraud, *or* (ii) to obtain property by means of false or fraudulent pretenses, representations or promises;[5] (2) that defendant did so with

---

3. The evidence presented at trial indicated that the $2500 fee paid to the investors was basically a payment for the use of the investor's credit rating in order to obtain the loan. Typically, the investors put no money of their own into the purchase of the properties.

4. Neither defendant or Hight were employed by Oxford Bank. However, defendant had known the president and chairman of the bank for several years. JA–MAR had several outstanding loans at the bank. Proceeds of the sale of the property through the Oxford Bank loan were used to pay down JA–MAR's indebtedness to the bank.

5. The district court instructed the jury in the disjunctive; that is, the jury was instructed that to find defendant guilty it had to find the defendant knowingly executed or attempted to execute a scheme (1) to defraud, *or* (2) to obtain property by means of false or fraudulent pretenses, misrepresentations, or promises. We have previously held that this disjunctive in-

the intent to defraud; and (3) that the financial institution was then insured by the Federal Deposit Insurance Corporation. *See* 18 U.S.C. § 1344; *United States v. Bonnett*, 877 F.2d 1450 (10th Cir.1989).

■ In order to convict the defendant of willful misapplication of bank funds under 18 U.S.C. § 656, the government was required to prove: (1) that defendant was a bank officer or director; (2) that each bank was a national or federally insured bank; (3) that the defendant willfully misapplied bank funds; and (4) that the defendant acted with intent to injure or defraud each bank. *See* 18 U.S.C. § 656; *United States v. Harenberg*, 732 F.2d 1507, 1511 (10th Cir.1984).

■ Defendant argues that there was insufficient evidence to convict him of bank fraud and misapplication of funds due to the fact that the owner of the Tipton, Hammon and Blanchard banks, John Hudson, who was also a director of each bank, was knowledgeable of the circumstances of the loans. Defendant points to trial testimony of Larry Baresal, who was a director of the Hammon and Tipton Banks and also did legal work for the banks. Baresal testified that both he and Hudson knew and were aware of defendant's interest in JA–MAR and were aware of the circumstances of the challenged loans.

Defendant frames his argument as a lack of sufficiency of the evidence to convict him of the offenses. However, defendant does not challenge the evidence as such, rather, he makes a legal argument that he cannot be guilty of the offenses charged because Hudson, the owner and a director of the banks, and Baresal, a director of the Tipton and Hammon banks and sometime lawyer for the Hudson-owned banks, were aware of the circumstances of the JA–MAR loans. The court finds such an argu-

ment to be an erroneous statement of the law. Hudson's and Baresal's knowledge or lack of knowledge of the circumstances of the loans is simply not determinative of the charges against defendant of bank fraud and misapplication of funds.

Defendant confuses the notion of defrauding a federally insured bank with the idea of defrauding its owner or directors. It is the financial institution itself—not its directors or agents—that is the victim of the fraud the statute proscribes. See *United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir.1992); *United States v. Blackmon*, 839 F.2d 900, 904–06 (2nd Cir.1988); S.Rep. No. 225, 98th Cong., 2nd Sess. 377 (1983) *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3517 (§ 1344 was "designed to provide an effective vehicle for the prosecution of frauds in which the victims are *financial institutions* that are federally created, controlled, or insured."). Section 1344 was intended to reach a wide range of fraudulent activity that undermines the integrity of the federal banking system. *Saks*, 964 F.2d at 1519.

Thus, even if Hudson knew the true nature of the loan transactions, the institutions could nevertheless be defrauded. A number of courts have concluded that if a borrower obtains funds at the insistence of and for the benefit of the bank officer, without disclosing the officer's interest on the loan documents, thereby flouting banking rules and regulations designed to protect the financial integrity of the bank, a jury can conclude that both borrower and officer acted with intent to defraud the bank. *See United States v. Saks*, 964 F.2d 1514, 1519 (5th Cir.1992); *United States v. Castiglia*, 894 F.2d 533, 536–38 (2nd Cir. 1990); *United States v. Walker*, 871 F.2d 1298, 1306–07 (6th Cir.1989); *United States v. Shively*, 715 F.2d 260 (7th Cir.1983).[6] We agree with this reasoning.

struction properly tracks the language of the statute and accurately states the necessary elements required to be found by a jury under the alternate prongs of 18 U.S.C. § 1344. *United States v. Bonnett*, 877 F.2d 1450 (10th Cir.1989).

**6.** The *Saks* case involved a violation of 18 U.S.C. § 1344. The *Saks* opinion noted that these reported cases "for the most part involve misappli-

cation of bank funds under 18 U.S.C. § 656." *Saks*, 964 F.2d at 1519. However, the *Saks* court noted that both § 656 and § 1344 require proof that the defendant intended to defraud or injure a bank, which is the element at issue here. Thus, the same argument applies to both statutes under which defendant was convicted.

Even assuming that Hudson's awareness was relevant to the question of whether defendant intended to defraud the banks, the evidence at trial showed that Hudson had resigned from the Tipton and Hammon Banks in August, 1986, months before the first loan charged in the indictment. Thus, by the time the loans were presented, Hudson was no longer with the banks and had no authority to authorize or approve loans for those banks.

Defendant's material non-disclosure in the formal loan process was clearly shown by the government at trial. Evidence was presented that defendant's interest in the particular loans was not included in the loan files, mentioned to the board members, or discussed at board or loan committee meetings. Moreover, there was specific testimony at trial that the banks and the escrow agents would not have approved the loans or authorized the payments at closing had the loan documents accurately reflected defendant's interest in the loans.

The court finds, after a thorough review of the proceedings below, that there was substantial evidence that defendant defrauded the banks and misapplied bank funds and, therefore, the evidence was sufficient to sustain the conviction.

### III. Admissibility of Evidence Regarding Defendant's Removal From Banking By the Comptroller of the Currency

Defendant contends that the government was wrongfully permitted to question Larry Baresal, who was called as a defense witness, and defendant himself regarding civil actions brought against them by the Office of the Comptroller of the Currency ("OCC"). In settlement of an administrative action brought by the OCC, Baresal, defendant and Hudson had all entered into a consent order imposing a lifetime ban on banking. Pursuant to the consent order, the three individuals could not re-enter banking without the OCC's prior consent.

Defendant brings his argument under two different theories. The first is that the evidence was improper other bad acts evidence which should not have been admitted

under Fed.R.Evid. 404(b). The second is that it should have been excluded under *United States v. Christo*, 614 F.2d 486 (5th Cir.1980). We do not agree on either score.

In general, the trial court has broad discretion in ruling on evidentiary matters. *United States v. Drake*, 932 F.2d 861, 866 (10th Cir.1991); *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir. 1988). We may not reverse the trial court's evidentiary rulings "in the absence of an abuse of discretion." *Id.* (citations omitted). We find that the government's questioning regarding the OCC ban during its cross-examination of Baresal and defendant was within the bounds of relevant cross-examination under Fed.R.Evid. 611(b) to impeach the witnesses' direct testimony. The district court did not abuse its discretion in allowing the questioning by the government on cross-examination regarding the OCC ban. It was neither Rule 404(b) evidence nor subject to exclusion under *Christo*.

On direct examination, both Baresal and defendant testified that the loan procedures they followed were responsible and in compliance with, or at least not contrary to, federal regulations; that John Hudson, owner of the banks, had approved the transactions with full knowledge of defendant's interest; that defendant had complied with federal regulations by disclosing his interests; and that they had made the loans for sound financial reasons and had acted in the bank's best interests. Defendant also testified as to his former experience as a bank examiner and professed to be familiar with banking regulations. In short, both Baresal and defendant painted a picture in their direct testimony that they exercised great care in making the loans, that they had expertise in banking rules and regulations, and that they followed proper banking procedures and regulations, as was their custom.

Given this line of direct testimony, the court finds that it was proper under Fed. R.Evid. 611(b) for the government to inquire as to the OCC ban on cross-examination for the purpose of attacking the credi-

bility of the witnesses.[7] Because both witnesses in their direct testimony testified regarding their care and expertise in following banking rules and regulations, the fact that as a result of an administrative investigation both had consented to a lifetime ban from banking is probative as to the credibility of the witnesses' testimony.

■ Defendant argues strenuously that the evidence regarding the OCC ban was not properly admitted under Fed.R.Evid. 404(b), and that no 404(b) limiting instruction was given (although he also candidly admits that none was requested). We find defendant's argument based on 404(b) standards to be incorrect because the government's cross-examination regarding the OCC ban was not 404(b) evidence. It went to the issue of the witnesses' credibility, and was properly admitted as impeachment under Fed.R.Evid. 611(b). Rule 404(b) deals with the handling of evidence of other crimes, wrongs or acts, making such inadmissible to prove character in order to show conformity therewith but allowing such for certain other limited purposes. The government did not offer the evidence for any of the purposes covered by Rule 404, proper or improper, but rather to impeach credibility. When matters are brought out in cross-examination for impeachment purposes, the appropriate evidentiary rule is 611(b). See *United States v. Smalley*, 754 F.2d 944, 951 (11th Cir. 1985). Our review of the record indicates that the trial court properly admitted the evidence for that purpose.[8]

We find defendant's argument that the evidence regarding the OCC ban is not admissible based on the holding in *United States v. Christo*, 614 F.2d 486 (5th Cir.

1980) to be equally incorrect. In *Christo*, the court found reversible error in the confusion, persistent throughout the trial and in the court's instructions, between the defendant's civil regulatory violations and the felony charges of misapplication of bank funds for which defendant was on trial. In *Christo*, the district court had repeatedly linked the civil violations with the criminal charges so as to suggest that evidence of the regulatory violations could be used as a basis to convict on the criminal charges. *Id.* at 490–92.

*Christo* was later distinguished in *United States v. Stefan*, 784 F.2d 1093, 1098 (11th Cir.1986). The *Stefan* court stated that:

> *Christo* forbids introducing evidence of civil banking violations solely for the purpose of proving criminal misapplication; however, it does not hold that such evidence can never be introduced in a criminal misapplication case.... If the evidence of civil violations is introduced for purposes other than to show criminal misapplication and the evidence is not presented in such a way that the jury's attention is focused on the civil violations rather than the criminal ones, there is no error.

*Id.*

In this case, the government's cross-examination of each witness was limited to the matter of whether, in fact, the witness had been banned from banking pursuant to an agreement with the OCC. There was no reference to any specific regulation that was violated. There was no mention by the court or the government that the civil regulatory violations or OCC ban should play any part in the jury's deliberations, nor

---

7. Federal Rule of Evidence 611(b) provides:

   **(b) Scope of cross-examination.** Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

8. The defendant did not raise on appeal an argument that this evidence, even if properly within the ambit of cross examination under Rule 611(b), should have been excluded under Fed.R.Evid. 403 because the danger of unfair prejudice substantially outweighed its probative value. He did make passing reference to the trial court of his concern about the "prejudicial effect" outweighing the "probative value," without reference to Rule 403 or to the significant modifiers "substantially" and "unfair" which guide the court's discretion. Without expressly balancing probative value and prejudicial effect according to the test set out in the rule, the trial court declined to exclude the evidence on this basis. We find no error in the trial court's conclusion, in any event.

was any jury instruction given to this effect. The OCC ban was touched on only marginally in the government's cross-examination not to establish that defendant had committed criminal violations, as in *Christo,* but rather to impeach the testimony of defendant and Baresal regarding their expertise in banking operations and their professed adherence to sound banking principles.

## IV. Conclusion

For the reasons stated above, the holding of the district court is affirmed.