**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

GARLAND LEE WALDROOP II,

      Defendant-Appellant.

No. 04-6308

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 03-87-R)**

Robert G. McCampbell, United States Attorney (Susan Dickerson Cox, Assistant United States Attorney with him on the brief), U.S. Attorney's Office, Oklahoma City, Oklahoma, for the Plaintiff-Appellee.

Gerald L. Hilsher, Boone, Smith, Davis, Hurts & Dickman, Tulsa, Oklahoma, for the Defendant-Appellant.

Before **LUCERO**, **ANDERSON,** and **MURPHY**, Circuit Judges.

**LUCERO**, Circuit Judge.

    Garland Lee Waldroop II, having been convicted of bank fraud and

conspiracy to commit bank fraud, appeals his convictions on the basis of

insufficient evidence. He also argues that his sentence was impermissibly enhanced based on judge-found facts in violation of <u>United States v. Booker</u>, 125 S. Ct. 738 (2005) and that, when enhancing his sentence based on the amount of losses he caused, the district court should have taken into account his civil settlement with the bank he defrauded. None of these arguments is availing. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **AFFIRM** Waldroop's conviction and sentence.

## I

The facts of this case are rooted in an ill-fated relationship between a banker of questionable ethics and Waldroop, a businessman with the dangerous combination of bad financial luck and tastes that well exceeded his means. As things this combustible often do, the relationship between Mike Mayfield, the banker, and Waldroop ignited and caused hundreds of thousands of dollars of losses to Mayfields' employer, First State Bank.

When he met Waldroop, Mayfield was an Executive Vice President at First State Bank. Mayfield was also involved in an enormous fraudulent loan scheme with a local businessman named Larry Paul that would soon be discovered. However, at the time, he was a respected banker and a man on the rise in the bank. Waldroop, too, was successful, operating his family steel construction

business. He was also well known in the literally fast-paced world of competitive midget-car racing.

Mayfield recruited Waldroop to join the bank's "Business Manager" program, which provided bridge financing for small businesses. This allowed small business owners to borrow against their receivables, allowing them to pay their expenses with credit and to repay the bank after they had billed their clients. Waldroop was admitted to the Business Manager program and began receiving credit from First State Bank.

In addition to the Business Manager loans, Mayfield approved a number of loans to Waldroop and his businesses, including personal loans that allowed Waldroop to buy real estate and luxury cars. In total, Mayfield authorized loans of over $1 million to Waldroop and his related companies. At First State Bank, both bank officers and borrowers were subject to lending limits. Each individual officer had a limit on how much he could lend to any one individual. Further, no individual officer could authorize the bank to lend more than a certain total amount to any one borrower, based on credit-worthiness. Debt limits for individuals included all associated entities, including corporations controlled by the individual. The money extended to Waldroop exceeded both the bank's normal limit for an individual and the amount Mayfield was personally authorized

to loan to an individual. However, the Board of Directors agreed to expand Waldroop's global limit.

Eventually, the Board of Directors made it clear that it would not approve any more exceptions to their ordinary debt limits. Waldroop wanted to buy a new red Chevrolet Corvette but Mayfield told him that the bank would not give him any more financing. Waldroop complained to the chairman of the bank, Frank Swan Sr., that Mayfield was not being cooperative. Swan told Mayfield to "get it resolved," but did not specify about how Mayfield should solve Waldroop's complaints.

Faced with this dilemma, Waldroop hatched an idea: the bank could nominally loan money to Waldroop's employee, David Chandler, but Waldroop would use the money to purchase the Corvette and would be responsible for the loan. This is a financing scheme known as a 'nominee' or 'straw' loan.

Mayfield agreed to nominally loan money to Chandler that was in fact intended for Waldroop. His reasons for doing so are not entirely clear, but may have been a response to a threat by Waldroop to default on his debts to the bank. As Waldroop's debts increased, Mayfield had become further enmeshed in the fraudulent loan scheme with Larry Paul. Mayfield was desperate to keep this scheme quiet and he thought that if Waldroop defaulted, Mayfield's other loans would be investigated. When combined with the bank chairman's instruction to

"get it resolved," Mayfield apparently had enough incentive to go along with Waldroop's scheme.

Mayfield approved a loan to Chandler for the Corvette. The Corvette served as collateral on the loan, but Chandler never actually owned the car. Instead, it was titled to a corporate entity controlled entirely by Waldroop. Waldroop personally received the cash rebate offered by the car dealer to purchasers of Corvettes.

This loan was quickly followed by three other nominee loans to Chandler that allowed Waldroop to purchase a Chevrolet pick-up truck and a bright purple-and-yellow Corvette with crossed racing flags painted on the side that served as the pace car for an IndyCar race. Mayfield also lent money to Chandler that allowed Waldroop to obtain a huge trailer to haul midget racing cars. In each case, the collateral was not owned by Chandler, the nominal recipient of the loan, but was instead in the hands of a Waldroop-controlled corporate entity.

After making these nominee loans to Chandler, another problem emerged. The total amount of these loans to Chandler was nearing the limit Mayfield could approve to any one individual. Mayfield and Waldroop decided to begin using different nominees and developed a plan to invest in real property. First, Mayfield lent money to an ostensibly independent company called Leecor Development that was actually controlled by Waldroop to buy a piece of property.

They then used that piece of property as collateral on a loan to Steelcraft Construction, a company owned by Waldroop's father. The money from that loan was given to a Waldroop-controlled company. They then approved a loan to Waldroop's mother, collateralized by the same piece of property, and gave the money to another Waldroop company.

Mayfield approved a nominee loan to Waldroop's brother that allowed Waldroop to buy a rig to pull the midget racing car trailer. This was part of a complicated multi-transaction loan. First, money was lent to Chandler to buy the trailer. Then, that loan was paid off with the proceeds of a nominee loan to Waldroop's brother. The loan to Waldroop's brother was bigger than the loan to Chandler and so the remainder of the borrowed money was used to pay off some of Waldroop's debts. Waldroop's brother thought he was getting title to the trailer in the deal, but Chandler and then a Waldroop-controlled corporation actually had title and never gave it to Waldroop's brother.

After the loan to Waldroop's brother paid off the loan to Chandler for the trailer, Mayfield was able to loan Chandler more money. Mayfield approved a loan to Chandler to buy a piece of property on which to build a midget sports car race track. So that the loan could be approved, Waldroop had Chandler list a "drot crane" that belonged to Waldroop as one of his assets, as well as the Corvette that was purchased with a previous nominee loan. Waldroop eventually

moved into a house on the property. Mayfield then approved another loan to Waldroop's mother using the race-ranch property as collateral. The proceeds were split between a Waldroop-controlled corporate entity and Chandler.

In total, Mayfield approved ten nominee loans to Waldroop. In all but two cases, the collateral on the loan was not owned by the nominal borrower. For all ten loans, the loan documents contained falsehoods. In all ten cases, Waldroop was eventually able to use the borrowed money. Waldroop secured all ten loans after being informed that he was over his debt limit and after proposing to use nominee loans to circumvent the bank's lending limit policy.

Throughout this period, Waldroop's businesses were failing. The loans from First State Bank, both the legitimate loans and nominee loans, were propping up the failing businesses. Although he was actually responsible for the loans, he was not making payments on any of them.

The scheme collapsed when the bank began investigating Mayfield for his loans to Larry Paul. After the bank discovered the illegal loans to Paul, the information was turned over to the government. Mayfield agreed to plead guilty to one count of bank fraud and to assist the federal government in their prosecution of Paul and anyone else with whom he participated in fraudulent loan transaction in return for the government recommending a downward departure at

sentencing. Mayfield was sentenced to five years' probation and ordered to pay $3,529,000 in restitution.

At this point, the FBI began investigating the loans to Waldroop. During an interview with the FBI, Mayfield stated that the Waldroop loans were not improper. In a later FBI interview, Mayfield recanted this testimony and described in detail the nominee loans that he and Waldroop created in order to get around Waldroop's lending limit.

The FBI investigation of Waldroop's loans began in March 2000. In August 2000, Waldroop entered into a civil settlement with First State Bank. The bank settled its claims against Waldroop in return for all collateral in his possession and the dismissal of his lender liability claims against the bank.

Waldroop was indicted for bank fraud and aiding and abetting in violation of 18 U.S.C. § 1344 and 18 U.S.C. § 2 and conspiracy to commit bank fraud in violation of 18 U.S.C. § 371. He was tried alongside Chandler, who was also indicted for bank fraud and conspiracy to commit bank fraud. Following a jury trial, Waldroop was found guilty on both counts and Chandler was acquitted on both counts. After a sentencing hearing, the district court found, for sentencing purposes, that the losses caused by Waldroop's fraud amounted to $179,979. This corresponded to a seven-level enhancement. Waldroop was sentenced at the top

of the applicable sentencing range to two thirty-month terms of imprisonment to be served concurrently.

## II

Waldroop argues that the government presented insufficient evidence to support his convictions for bank fraud and conspiracy to commit bank fraud. Sufficiency of evidence is a question of law that we review de novo. United States v. Dazey, 403 F.3d 1147, 1159 (10th Cir. 2005). Viewing all evidence in the light most favorable to the government, "[w]e examine all of the evidence and the reasonable inferences to be drawn from that evidence, to determine whether any rational juror could have found the elements of the crime beyond a reasonable doubt." Id. Because a rational juror could find Waldroop guilty beyond a reasonable doubt, his challenge fails.

Waldroop was found guilty of bank fraud and conspiracy to commit bank fraud. To prove bank fraud, the government must show that (1) the defendant knowingly executed or attempted to execute a scheme or artifice to defraud a financial institution, (2) the defendant had the intent to defraud a financial institution and (3) the bank involved was federally insured. 18 U.S.C. § 1344; United States v. Hill, 197 F.3d 436, 444 (10th Cir. 1999). To prove conspiracy, the government must show there was an agreement to break the law, that there was an overt act which was in furtherance of the conspiracy's object, and that the

defendant wilfully entered the conspiracy.  <u>Dazey</u>, 403 F.3d at 1159.  Although he acknowledges that he knew the terms of each of the loans, Waldroop argues that there is no evidence that he knew the bank was deceived by the schemes.  Further, he argues that he did not have the requisite intent to commit bank fraud.  Finally, he claims that there was insufficient evidence to support his conviction for conspiracy to commit bank fraud because he did not have the requisite intent to commit bank fraud in the first place.

Nominee loans are not inherently illegal, but are illegal if they are used to deceive a financial institution about the true identity of a borrower.  <u>See</u> <u>United States v. Doke</u>, 171 F.3d 240, 245 (5th Cir. 1999) ("a nominee loan is not illegal where there is no evidence that the transaction is concealed from the bank, and where the loan documents make the relationship between the various transactions very clear"); <u>United States v. Willis</u>, 997 F.2d 407, 410 n.2 (8th Cir. 1993) ("Nominee loans are not illegal per se.  They are illegal, however, when the borrower and the bank officer fail to state the real borrower and recipient of the funds, thereby obtaining the loans by means of false pretenses.").

In <u>United States v. Bonnett</u>, 877 F.2d 1450 (10th Cir. 1989), this court explained that a borrower who receives funds from a nominee loan is guilty of bank fraud if he intends to conceal the fact that he will receive the funds (and knows that such information is being concealed).  If the true recipient of a

nominee loan "received the money, and this was intentionally concealed from Bank's board of directors and federal regulatory authorities," then that person is guilty of bank fraud. Id. at 1459. Notably, neither a nominal borrower's knowledge about the terms of a nominee loan nor the nominal borrower's ability to pay back a nominee loan is a defense. Id. at 1462.

The government introduced three crucial types of evidence showing that Waldroop both knew he was deceiving First State Bank and intended to do so. The first, and most important, were the loan documents themselves. In each and every case, the documents contained no information that money was actually flowing to Waldroop or his related companies. Moreover, in most of the loans, the pledged collateral actually belonged to Waldroop or a Waldroop-controlled entity and not to the nominal borrower. This falsehood had the effect of substantially increasing the risk to the bank. As Mayfield testified, "on a nominee loan, . . . the bank would be in a situation that it could only go against [the nominee] for the face amount of the note and may not have any perfected lien on the actual property that may be endowed."

The second crucial piece of evidence was Mayfield's testimony. Mayfield testified that he told Waldroop that the bank would not loan Waldroop any more money because Waldroop had reached his loan limit. He also testified that Waldroop came up with the plan to use nominee loans as a way around this limit,

suggesting that First State Bank loan money to him based on loan documents that did not have his name on them. Further, Mayfield testified that Waldroop bullied him into complying with the nominee loan scheme by threatening to default on his legitimate loans.

Finally, Waldroop's co-defendant, Chandler, testified that Waldroop said that he personally could not get a loan from First State Bank and suggested that Chandler sign the loan applications so that Waldroop could get additional credit.

In response, Waldroop argues that he informed Mayfield and Mayfield's secretary of his involvement with the loans. However, this is not a defense to the charge that he colluded with Mayfield to commit bank fraud. "It is the financial institution itself – not its officers or agents – that is the victim of the fraud [18 U.S.C. § 1344] proscribes. . . . It follows that bank customers who collude with bank officers to defraud banks may also be held criminally accountable either as principals or as aiders and abettors." United States v. Saks, 964 F.2d 1514, 1518-19 (5th Cir. 1992). Waldroop did not present any evidence that Mayfield tricked him into signing false loan documents.

Waldroop also claims that he openly used and possessed the items that he purchased through the use of the nominee loans. Further, he argues that Mayfield was not trustworthy and had lied to the FBI. This was surely considered by the jury when it considered the evidence in the case. When reviewing challenges to

the sufficiency of the evidence, this court does not suddenly transform itself into a jury; we simply examine whether there was enough evidence presented that a rational juror could find the defendant guilty beyond a reasonable doubt. Importantly, "we do not weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury." United States v. Castorena-Jaime, 285 F.3d 916, 933 (10th Cir. 2002). In this case, there was more than enough evidence presented that Waldroop was guilty of bank fraud and conspiracy to commit bank fraud. Accordingly, his challenge fails.

### III

Waldroop advances two arguments challenging the district court's sentencing decision. First, he argues that the district court violated his Sixth Amendment rights pursuant to United States v. Booker, 125 S.Ct. 738 (2005), by relying on judge-found facts to enhance his sentence. He also argues that the district court erred in excluding his civil settlement with First State Bank when determining the amount of loss for sentencing enhancement purposes. Both of these claims lack merit.

The court calculated the amount of loss for the purposes of imposing a § 2F1.1 sentencing enhancement under the 1998 edition of the United States Sentencing Guidelines manual. After rejecting Waldroop's argument that mandatory application of the sentencing guidelines would violate Blakely v.

Washington, 542 U.S. 296 (2004), the court found that a seven-level enhancement was appropriate and then sentenced Waldroop to 30 months imprisonment, the top of the applicable range.

The district court clearly committed constitutional Booker error by finding facts to increase a sentence. See United States v. Gonzalez-Huerta, 403 F.3d 727, 731 (10th Cir. 2005) (Constitutional Booker error occurs when the district court relies "upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily.") (internal quotation marks omitted). Where a sentencing court commits constitutional Booker error, and the defendant objected below on Booker (or Blakely) grounds, the government bears the burden of proving beyond a reasonable doubt that the error was harmless. United States v. Riccardi, 405 F.3d 852, 874-75 (10th Cir. 2005). It has done so in this case.

Waldroop was sentenced to the highest possible term in the sentencing range. Id. at 876 ("Having exercised his limited discretion under the pre-Booker system to give Mr. Riccardi the highest permissible sentence, there is no reason to think the judge would exercise his now-greater discretion to reduce the sentence.") Further, during sentencing, the district court lectured Waldroop on the avarice he showed in committing fraud and in involving his loved ones in his pursuit of more and more material possessions:

> I was rather startled at the time of trial by the greed that you showed, that you were willing to involve your brother and your mother and –

is it your father that was also involved – but at least your other friends in your pursuit of greed to buy Corvettes and to buy property and other items just to satisfy your own – your own greed. And there's got to be a consequence to that. And it will be reflected in the sentence imposed by the Court.

All evidence in the record points to the fact that, given greater discretion, the district court would not reduce Waldroop's sentence. Accordingly, the error was harmless.

Waldroop's other argument challenging his sentence is similarly unavailing. When enhancing a sentence pursuant to USSG § 2F1.1 (since repealed), the district court must determine the "actual loss" caused by the fraud. Waldroop argues that the district court improperly refused to reduce the amount of actual loss because of his civil settlement with First State Bank. Had the court included the settlement in its calculation of "actual loss," the amount of loss would have been zero. First State Bank agreed to settle all claims against Waldroop in return for the loan collateral and the dismissal of his lender liability claims against the bank. "We review the district court's determination of USSG § 2F1.1 loss under the clearly erroneous standard, but we review the factors the district court may properly consider de novo." United States v. Moore, 55 F.3d 1500, 1501 (10th Cir. 1995).

Waldroop's argument conflicts with the Sentencing Guidelines. Application Note 7(b) to USSG § 2F1.1 then stated: "[t]he loss is the amount of

the loan not repaid <u>at the time the offense is discovered</u>, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan" (emphasis added). Although the Guidelines are now advisory, application notes are authoritative about the proper interpretation of the Guidelines, unless they violate the Constitution, a federal statute, or are inconsistent with the text. <u>See</u> <u>Stinson v. United States</u>, 508 U.S. 36, 38 (1993). The offense was clearly discovered by the time of Waldroop's civil settlement and, hence, was properly excluded from the district court's determination about the actual loss caused by Waldroop's fraudulent actions.

Waldroop's argument also directly conflicts with the clear precedent of this court. In <u>United States v. Pappert</u>, 112 F.3d 1073, 1079 (10th Cir. 1997), we made clear that civil settlements made after the discovery of fraud are excluded from consideration when calculating the "actual loss" for the purposes of the USSG § 2F1.1 enhancement.[1] Although the actual amount of loss should be calculated "by subtracting the value of what was given to the victim(s) during the

---

[1] Waldroop argues that our decision in <u>United States v. Gallegos</u>, 975 F.2d 710, 712-13 (10th Cir. 1992), mandates that his settlement with First State Bank be included in the calculation of actual loss. This is not right. We specifically rejected this reading of <u>Gallegos</u> in <u>Pappert</u>. The plaintiff in <u>Pappert</u> relied on <u>Gellegos</u> "for his assertion that the amounts repaid to his creditors should be subtracted from the loss total. <u>Gallegos</u> does not support this position . . . . We did not hold that the guidelines require deduction of monies actually returned to the victims." <u>Pappert</u>, 112 F.3d at 1079 n.2.

course of the transaction from the value of what was fraudulently taken," settlements made with victims of fraud after the fraud is discovered are not payments made during the transaction. Id. at 1079. "Were we to hold that it was erroneous for the court to sentence him based on reimbursed losses, we would enable defendants to buy a sentence reduction after being caught. The guidelines do not authorize such a principle, and we reject it." Id. The district court properly excluded Waldroop's settlement with First State Bank when calculating the actual loss caused by his fraud.

## IV

There was more than sufficient evidence to convict Waldroop of bank fraud and conspiracy to commit bank fraud. Additionally, although the district court committed constitutional Booker error, that error was harmless. Waldroop's settlement with First State Bank was properly excluded from the court's calculation of the actual loss caused by his fraud. Accordingly, we **AFFIRM** the district court.