**F I L E D**

**UNITED STATES COURT OF APPEALS**

**March 14, 2006**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GARY BRINSFIELD,

    Defendant - Appellant.

No. 04-6404
(W.D. Oklahoma)
(D.Ct. No. 03-CR-15-L)

## ORDER AND JUDGMENT[*]

Before **KELLY**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Gary Brinsfield was convicted by a jury of six counts of bank fraud and two counts of making a false statement in order to influence a bank. He was

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

sentenced to 41 months imprisonment. Brinsfield appeals his convictions and sentence. Exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm.

## I. Background

Brinsfield owned an automotive repair shop and an auto body shop in Noble, Oklahoma, and a salvage yard in Slaughterville, Oklahoma. He operated these businesses under the names Gary's Auto Sales, Gary's Auto Repair and Gary Brinsfield's Used Cars. He specialized in rebuilding damaged pickup trucks for resale.

In the 1980's, Charles Huffman was a loan officer at Norman Bank of Commerce in Norman, Oklahoma. While there, he met Brinsfield and became his personal loan officer. During the next fourteen years, Huffman changed bank employers several times. Each time he did so, Brinsfield followed him.

In October 1994, Huffman began working as a consumer loan officer and vice president for Republic Bank of Norman (Republic). His lending limits for secured and unsecured loans were $25,000 and $10,000, respectively. If a loan exceeded these amounts, it had to be approved by a committee consisting of the bank's president, its loan officers and one or two of its directors.

While at Republic, Huffman approved a number of loans to Brinsfield. The loans ranged in value from $20,000 to $25,000 and were used to purchase

damaged vehicles for repair and resale.  Eventually, Brinsfield encountered problems re-paying the loans.  As a result, Chuck Thompson, the bank's president, informed Huffman to cease making loans to Brinsfield.

Huffman informed Brinsfield of Thompson's decision.  However, Brinsfield still needed money, in part, to pay off his outstanding loans.  Huffman also had a personal incentive to ensure Brinsfield had money.  Huffman had financial troubles as a result of a gambling problem and had borrowed $15,000 to $20,000 from Brinsfield.  He was concerned that if he stopped making loans to Brinsfield, his own source of funds would "dry up."  (R. Vol. 2 at 28.) Additionally, Huffman had borrowed money from another bank to purchase damaged vehicles to be rebuilt and resold by Brinsfield.  In order to repay the bank, Huffman needed Brinsfield to rebuild the vehicles, which required money. Thus, to keep money flowing to Brinsfield, Huffman and Brinsfield constructed loans to Brinsfield in the names of third-party borrowers (called nominees).

Under Huffman and Brinsfield's scheme, Brinsfield would persuade friends, acquaintances and employees to complete and sign loan documents, telling them they would not be responsible for repaying the loan.[1]  Sometimes he

---

[1] There were five nominees involved in Counts 1-6:  James Wiseman (Counts 1 and 2), Earl Curren (Count 3), Linda Sallee (Count 4), Rebecca McCoy (Count 5) and Amy Burnaman (Count 6).  Wiseman, Sallee, McCoy and Burnaman all testified Brinsfield told them they would not be responsible for repaying the loan.  As to Count 2, Wiseman testified Brinsfield told him there was an error in the previous loan application

paid them for signing the documents. Brinsfield would then provide these documents to Huffman, who would process them without ever speaking to the nominee. Huffman then issued the loan proceeds to either Gary's Auto Sales or Gary Brinsfield's Used Cars. Although the loan was in the nominee's name, at all times Huffman understood that Brinsfield was the actual borrower and was obligated to pay off the loan.

As collateral, Brinsfield would provide Huffman with a vehicle's make, model, year and vehicle identification number (VIN). Without observing the vehicle, Huffman would assign a value to the vehicle using the National Automotive Dealers Association (NADA) manual. This manual provides three different values: loan value, trade-in value and retail value. Normally, in making a loan, a bank uses the lowest value, the loan value. However, in processing Brinsfield's loans, Huffman used the highest value—the retail value—in order to secure Brinsfield the most money.

In order to prevent committee review, all of the nominee loans made to Brinsfield were at or below Huffman's lending limit ($25,000). Because the

Wiseman had signed. Thus, Wiseman signed another loan application, believing he was doing so to correct the previous application. In fact, the application was for a separate loan. Curren testified he told Brinsfield he was interested in purchasing a new truck but doubted he could obtain financing. Brinsfield informed Curren he could help him obtain a loan and brought Curren loan documents from Republic. Curren completed the forms, signed them and gave them to Brinsfield. Later, Brinsfield told Curren the loan had not been approved.

-4-

loans were processed under third-party names, Republic was unaware that Brinsfield was the true borrower. In fact, Huffman often doctored the loans to make it appear that he spoke with the nominee and that the nominee was the actual borrower.

Eventually, the loans became delinquent. Huffman contacted Brinsfield who stated he was short on cash but would "get it taken care of." (R. Vol. 2 at 111.) It was not. In late 1997 or early 1998, Huffman finally informed Republic of the true nature of the loans. Huffman was fired but was retained temporarily to assist Republic in identifying the loans, as they were processed under the nominees' names. In all, Huffman had made approximately fifty-eight nominee loans to Brinsfield, totaling a little over one million dollars.

After Huffman confessed, Republic attempted to locate the collateral securing the loans. It made a list of the vehicles and their respective VINS; over 100 vehicles were involved. Bank officials found fifty to seventy-five vehicles during a visit to Brinsfield's salvage yard. When they located a vehicle, they took a picture of it. Several weeks later, Brinsfield provided Republic with several more of the vehicles. The vast majority of the vehicles pledged as collateral were actually parts of a pickup truck, *i.e.*, the bed, chassis or cab.

On February 5, 2003, Brinsfield was indicted for one count of bank fraud in violation of 18 U.S.C. § 1344(1) and two counts of making a false statement in

violation of 18 U.S.C. § 1014.  On July 2, 2003, a superseding indictment was filed, charging Brinsfield with six counts of bank fraud in violation of 18 U.S.C. § 1344(1) (Counts 1-6) and two counts of making a false statement in violation of 18 U.S.C. § 1014 (Counts 7-8).[2]  Brinsfield proceeded to trial.  On September 16, 2003, the jury returned a guilty verdict on all eight counts.

Sentencing was originally scheduled for November 19, 2004.  Because Brinsfield failed to appear, the district court issued a warrant for his arrest.  Sentencing was re-scheduled for December 9, 2004.  This time, Brinsfield appeared.  He was sentenced to 41 months imprisonment and ordered to pay restitution in the amount of $893,979.66.

## II.  Discussion

On appeal, Brinsfield attacks both his conviction and sentence, arguing (1) the government presented insufficient evidence at trial to support his convictions and (2) he was sentenced in violation of the Sixth Amendment under *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005).  We address each argument in turn.

A.  Sufficiency of the Evidence

Brinsfield argues the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he committed any of the offenses charged.  He

---

[2] All but Count 8 also alleged aiding and abetting in violation of 18 U.S.C. § 2.

contends the evidence showed he asked family and friends to help him by taking out loans. He alleged these individuals applied for these loans "with their eyes open." (Appellant's Br. at 14.) Although the nominees believed Brinsfield would pay off the loans, which he did for a long time, Brinsfield contends the loans to them were valid. Indeed, he states he worked directly with Republic's vice president, Huffman. Brinsfield argues he was merely running a business and never intended to defraud the bank.

"We review de novo whether the prosecution presented sufficient evidence to support a conviction." *United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002). "In conducting this review . . . we ask whether, taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotations omitted). We will not evaluate witness credibility or re-weigh the evidence. *Id.* We will only reverse a conviction if no rational trier of fact could have reached the disputed verdict. *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.* (citation and quotations omitted).

1.  Bank Fraud (Counts 1 through 6)

"To prove bank fraud [under 18 U.S.C. § 1344(1)], the government must show that (1) the defendant knowingly executed or attempted to execute a scheme or artiface to defraud a financial institution, (2) the defendant had the intent to defraud a financial institution and (3) the bank involved was federally insured." *United States v. Waldroop*, 431 F.3d 736, 741 (10th Cir. 2005). "[T]he phrase 'scheme or artiface to defraud' simply requires a design, plan, or ingenious contrivance or device to defraud." *United States v. Hill*, 197 F.3d 436, 444 (10th Cir. 1999). "[A] scheme can involve fraudulent misrepresentations to deceive a bank to obtain money." *United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991).

Brinsfield does not challenge the third element and rightly so. At trial, Brett Sullivan, a loan review and compliance officer for Republic, testified Republic was FDIC insured. As to the first and second elements, the government clearly met its burden at trial.

Nominee loans are not illegal *per se*. *Waldroop*, 431 F.3d at 741. However, they are unlawful if used to deceive a bank about the true identity of the borrower. *Id.* "[A] borrower who receives funds from a nominee loan is guilty of bank fraud if he intends to conceal the fact that he will receive the funds (and knows that such information is being concealed)." *Id.* (citing *United States*

-8-

*v. Bonnett*, 877 F.2d 1450 (10th Cir. 1989)). That the nominee is aware of the terms of the loan or has the ability to repay the loan is not a defense. *Id.*

Here, although all of the loans at issue in Counts 1 through 6 were in the name of a third party, the evidence showed that Brinsfield was the actual borrower. All of the nominees testified to this effect, stating they only agreed to sign for the loan with the understanding that they would not be responsible for repaying it (Counts 1, 4, 5 and 6) or they never knew a loan had been taken out in their name (Counts 2 and 3). Although Brinsfield paid a few of the nominees for signing the loan papers, none of them received any of the loan proceeds. All of the proceeds were given to Brinsfield. Huffman also testified that Brinsfield was the actual borrower. He stated that under normal circumstances, he would not have made the loans to the nominees, given their financial condition or the lack of information regarding their financial condition. However, Huffman testified he approved the loans anyway because he knew Brinsfield was the true borrower and needed the money.

The evidence also showed that the loan documents did not reveal Brinsfield was the actual borrower. Huffman testified all of the loans were in the nominees' names and Republic would not know from looking at the loan documents that Brinsfield was the actual borrower. Huffman also testified Republic needed his assistance in identifying the loans as they were processed under the nominees'

names.

Additionally, Huffman testified that Thompson had instructed him not to make any further loans to Brinsfield. Huffman told Brinsfield he could no longer extend credit to him. However, because Brinsfield needed money and Huffman had a personal incentive to ensure that Brinsfield had money, Huffman and Brinsfield circumvented Thompson's directive by processing loans to Brinsfield in the names of third parties. Thus, the jury could reasonably conclude that Huffman and Brinsfield constructed the nominee loans in order to deceive Republic.

Moreover, Brinsfield pledged the collateral for these loans. Using the information provided by Brinsfield, Huffman valued the collateral using its retail value rather than its loan value. Although this practice was contrary to bank policy, Huffman testified he did so to secure Brinsfield the most money. While Huffman believed Brinsfield was pledging whole vehicles, in actuality, most of the collateral consisted of parts of vehicles with little value.[3] Both Huffman and Sullivan testified banks rely on collateral to mitigate their risk in making a loan.

---

[3] For example, the nominee loan involved in Count 3 (the Curren loan) was secured by a 1995 Chevrolet extended cab pickup truck and a 1993 Chevrolet pickup truck. Huffman assigned these vehicles loan values of $15,600 and $11,400, respectively. The 1995 pickup had extensive fire damage, was missing its bed and could not be rebuilt. Its value was estimated at $20-$25. The 1993 pickup consisted solely of the cab, could not be rebuilt and was worth $5. Sullivan testified he would not have approved a loan secured by this collateral.

Both stated that under normal circumstances, a bank seeks collateral with a value similar to the amount of the loan so if the loan goes into default, the bank can sell the collateral and recoup most of the loan amount. By pledging collateral which appeared to be whole vehicles, Brinsfield deceived Republic and exposed it to substantial risk in the event the loans became delinquent.

That Huffman, a bank officer, was aware of the fraudulent scheme and worked with Brinsfield is irrelevant. *Waldroop*, 431 F.3d at 742; *United States v. Rackley*, 986 F.2d 1357, 1361 (10th Cir. 1993). Section 1344 prohibits defrauding a financial institution, not its directors or agents. *Id.* "It follows that bank customers who collude with bank officers to defraud banks may also be held criminally accountable either as principals or as aiders and abettors." *Waldroop*, 431 F.3d at 742 (quotations omitted). There was no evidence that Huffman tricked Brinsfield into securing false nominee loans. In fact, the evidence showed Brinsfield provided the loan documents to the nominees, secured their signatures and delivered the signed documents to Huffman. Therefore, even if Huffman was aware of the misrepresentations Brinsfield made to the nominees, Republic could still be defrauded.

Based on the above, there was more than sufficient evidence to support the jury's verdicts on Counts 1 through 6.

2. False Statement (Counts 7 through 8)

Brinsfield alleges, without any legal or factual argument, that the government provided insufficient evidence supporting his convictions on Counts 7 through 8. While normally such a perfunctory argument is insufficient to invoke our review, we consider it anyway because we can readily dispose of it. *LaFevers v. Gibson*, 182 F.3d 705, 725 (10th Cir. 1999) ("We have repeatedly warned litigants that issues adverted to in a perfunctory manner and without developed argumentation are deemed waived on appeal.").

To convict Brinsfield for making a false statement under 18 U.S.C. § 1014, the government had to prove beyond a reasonable doubt that he "made a false statement to a federally insured bank knowing the statement was false and intending to influence the bank." *United States v. Copus*, 110 F.3d 1529, 1534-35 (10th Cir. 1997). The government clearly met its burden. Huffman testified Brinsfield brought him a personal loan application in the name of David Ryan Kill (Count 7). Kill testified he never filled out a Republic loan application, did not sign it and did not give anyone permission to sign it. Huffman testified he was not aware that Kill's signature had been forged. Brinsfield used the false application to influence Republic to make a $11,640.26 loan to Kill with the proceeds payable to Gary's Auto Sales. As to Count 8, Huffman testified Brinsfield secured a $10,589.00 loan with a 1992 Chevrolet pickup truck and obtained the loan proceeds. Huffman stated he believed the truck was a full vehicle. However, it was actually a severely damaged

truck cab worth $10-$15.

Based on the above, there was sufficient evidence to support the jury's verdicts on Counts 7 and 8.

B. *Booker*

After the jury returned its verdicts, a presentence investigation report (PSR) was prepared.[4] Applying USSG §2F1.1, the guideline applicable for violations of 18 U.S.C. §§ 1014 and 1344, the probation officer determined Brinsfield's base offense level was 6. Relying on Republic's declaration of victim loss, the officer determined Republic's loss was $893,979.66[5] and increased the base offense level by 11 pursuant to USSG §2F1.1(b)(1)(L) (requiring an 11-level increase to the base offense level if the amount of loss is between $800,000 and $1,500,000). The officer also added 2 levels because the offense involved more than minimal planning. *See* USSG §2F1.1(b)(2). Because Brinsfield failed to appear at sentencing, the officer applied a 2-level upward adjustment for obstruction of justice. *See* USSG §3C1.1. Based on a total offense level of 21 and a criminal history category of I, the probation officer calculated the guideline range as 37-46 months imprisonment. He also recommended

_____

[4] Brinsfield was sentenced pursuant to the 1997 edition of the United States Sentencing Guidelines Manual. All citations to the guidelines herein refer to the 1997 guidelines unless otherwise indicated.

[5] According to Republic's declaration, it made loans to Brinsfield totaling $989,475.21, of which only $95,495.55 was repaid, resulting in a loss of $893,979.66.

Brinsfield be ordered to make restitution in the amount of $893,979.66.[6]

Brinsfield raised several objections to the PSR under *Blakely v. Washington*, 542 U.S. 296 (2004). First, he argued the amount of loss alleged in the indictment and proven at trial was only $146,175.26, the total amount of the loans at issue in Counts 1 through 8.[7] Thus, he contended his base offense level should only be increased by 7 levels. *See* USSG §2F1.1(b)(1)(H) (authorizing a 7-level increase if the amount of loss falls between $120,000 and $200,000). Brinsfield also objected to the 2-level enhancement for more than minimal planning and the 2-level upward adjustment for obstruction of justice because the facts supporting them were not charged in the indictment, proven at trial or stipulated to. As such, Brinsfield argued his total offense level was 13, resulting in a guideline range of 12-18 months imprisonment.

The district court rejected Brinsfield's arguments. Adopting the recommendations in the PSR, the court sentenced Brinsfield to 41 months imprisonment, the middle of the guideline range. It also ordered Brinsfield to pay restitution in the amount of $893,979.66, to be paid jointly and severally with

---

[6] Of this amount, $143,979.66 was owed to Republic. The remainder, $750,000, was to be paid to Republic's insurer, St. Paul Insurance Company.

[7] In his written objections, Brinsfield erroneously stated the amount of the loans involved in Counts 1-8 totaled $116,175.26. At sentencing, Brinsfield corrected the error.

Huffman.[8]

On appeal, Brinsfield asserts his sentence, imposed pursuant to the mandatory federal sentencing guidelines and enhanced pursuant to judicial fact-finding by a preponderance of the evidence, violates the Sixth Amendment under *Booker*. In *Booker*, the Supreme Court extended its holding in *Blakely* to the federal sentencing guidelines, holding that the Sixth Amendment requires "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict [to] be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. To remedy the constitutional infirmity of the guidelines, *Booker* invalidated their mandatory nature, requiring the district court to consult them in an advisory fashion. *Id.* at 756-57 (severing and excising 18 U.S.C. §§ 3553(b)(1), 3742(e)).

In *United States v. Gonzalez-Huerta*, we determined there were two types of error a district court could commit prior to *Booker*:

> First, a court could err by relying upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily. As *Booker* makes clear, the Sixth Amendment prohibits this practice. As a matter of convenience, we will refer to such an error as a constitutional *Booker* error. Second, a sentencing court could err by applying the Guidelines in a mandatory fashion, as opposed to a discretionary fashion,

---

[8] In November 2002, Huffman pled guilty to conspiracy to commit bank fraud. On October 21, 2003, he was sentenced to 48 months probation.

even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction. While this type of sentence does not violate the Sixth Amendment, such a sentence is nonetheless impermissible because the Court severed the portion of the Sentencing Reform Act that required the mandatory application of the Guidelines. We will refer to this second type of error as a non-constitutional *Booker* error.

403 F.3d 727, 731-32 (10th Cir.) (quotations and citations omitted), *cert. denied*, 126 S.Ct. 495 (2005). Here, the district court clearly committed constitutional *Booker* error at sentencing because it relied upon facts neither found by the jury nor admitted by Brinsfield to enhance his sentence mandatorily.

Because Brinsfield objected in the district court under *Blakely*, we review his sentence for harmless error. *United States v. Corchado*, 427 F.3d 815, 820 (10th Cir. 2005). Thus, our inquiry is whether the court's constitutional error at sentencing was harmless under Rule 52(a) of the Federal Rules of Criminal Procedure. *United States v. Lang*, 405 F.3d 1060, 1064 (10th Cir. 2005). Rule 52(a) states: "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." The government bears the burden of demonstrating the error was harmless and in cases involving constitutional error, it must do so beyond a reasonable doubt. *Lang*, 405 F.3d at 1065.

The government argues the constitutional error at sentencing was harmless in this case because the amount of loss and more than minimal planning enhancements were overwhelmingly supported by the evidence at trial and did not affect

-16-

Brinsfield's substantial rights. It also asserts Brinsfield's willful failure to appear

for sentencing supports the obstruction of justice adjustment. Lastly, the government

contends there is no indication in the record that the district court was dissatisfied

with the mandatory guidelines or that the court would be inclined to impose a lower

sentence under an advisory guideline scheme. Indeed, it points out that the court

imposed a sentence in the middle of the guideline range. We agree.

Section 2F1.1(b)(2) of the guidelines requires a 2-level enhancement to the

base offense level if "the offense involved [] more than minimal planning . . . ." The

Commentary to §2F1.1 refers to the Commentary to §1B1.1 for the definition of

"[m]ore than minimal planning." USSG §2F1.1 comment. (n.2). The Commentary to

§1B1.1 states:

> "More than minimal planning" means more planning than is typical for
> commission of the offense in a simple form. "More than minimal
> planning" also exists if significant affirmative steps were taken to
> conceal the offense, other than conduct to which § 3C1.1 (Obstructing
> or Impeding the Administration of Justice) applies. "More than minimal
> planning" is deemed present in any case involving repeated acts over a
> period of time, unless it is clear that each instance was purely
> opportune. Consequently, this adjustment will apply especially
> frequently in property offenses.

USSG §1B1.1, comment. (n.1(f)). "[T]he notion of repeated acts refers to a series of

acts each of which would be criminal standing alone, rather than referring to a crime

that requires the completion of a series of steps." *United States v. Proffit*, 304 F.3d

1001, 1005 (10th Cir. 2002). In order to have "repeated acts," "there must have been

more than two instances of the behavior in question." *United States v. Bridges*, 50 F.3d 789, 793 (10th Cir. 1994). By finding Brinsfield guilty on Counts 1 through 6, the jury necessarily found that his offense involved more than minimal planning because Counts 1 through 6 involved six acts of bank fraud over the course of two and a half years (May 1995 to December 1997) and each act was not "purely opportune."

Section 3C1.1 of the guidelines requires a 2-level upward adjustment to the offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the . . . sentencing of the instant offense . . . ." The Commentary to §3C1.1 provides a non-exhaustive list of examples of conduct to which the adjustment applies. USSG §3C1.1, comment. (n.3). One such example is "willfully failing to appear, as ordered, for a judicial proceeding." *Id.* at (n.3(e)). Here, Brinsfield admitted at sentencing that he did not appear at the original sentencing hearing. While he stated he was "real sick" and his vehicle was "broke[n] down," he conceded his attorney had told him the hearing could not be re-scheduled. (R. Vol. 4 at 5.) He also failed to provide the district court with the medical documentation it requested. It is also clear that Brinsfield did not attempt to self-surrender after the district court issued a bench warrant for his arrest, apparently because he "got scared and didn't know what to do." (*Id.*) We conclude the jury, had it been presented with these facts, would have found that the

obstruction of justice adjustment was warranted.[9]

As to the amount of loss enhancement, by finding Brinsfield guilty on Counts 1 through 8, the jury necessarily found that Republic suffered loss in the amount of $146,175.26, the total amount of the loans at issue in Counts 1 through 8. Indeed, Brinsfield stipulated to this amount at sentencing. However, there was also testimony supporting the district court's finding that the total amount of loss was $893,979.66. Huffman testified approximately fifty-eight loans were involved in the scheme to defraud and Republic lost approximately $900,000 on these loans. Sullivan testified the aggregate amount of the fifty-eight loans involved was a little over $1 million and when confronted, Brinsfield signed two new promissory notes to the

---

[9] Indeed, these admissions appear to render the application of the obstruction of justice adjustment non-constitutional *Booker* error. Moreover, we are confident the district court would impose the obstruction of justice adjustment even under a purely discretionary sentencing guideline scheme. At sentencing, the court stated:

> Well, Mr. Brinsfield, you certainly did not help yourself by not appearing when you were supposed to at sentencing and of course it created a situation where the guidelines are now higher and you are going to end up serving, under the best of circumstances, probably a year longer than you would have served if you had appeared at sentencing. And the Court became somewhat concerned earlier when I made several requests for some medical documentation and asked [your attorney] on several occasions if he had received that and why it had not been forwarded [to] the Court. He informed me that he had requested of you to furnish that to the Court and that he had not been provided a copy, so it appears that the Court's request or orders meant very little.

(R. Vol. 4 at 7.)

bank, one covering the principal balance ($842,000) and one covering interest ($146,000). Sullivan further testified that Brinsfield made $95,000 in payments on these notes, leaving a loss of approximately $900,000. By signing the two promissory notes and making payments on them, Brinsfield essentially admitted that the amount of loss to Republic as a result of his actions was about $900,000, which supports an 11-level enhancement under USSG §2F1.1(b)(1)(L). However, we need not decide whether the signing of the promissory notes constituted a sufficient admission for purposes of *Booker*. Even if insufficient, the promissary notes are potent evidence of the amount of loss. Further, both Huffman and Sullivan testified the approximate loss to Republic was $900,000. There was no evidence contradicting their testimony and both were intimately familiar with the nominee loans and their amounts. It also appears based on the verdicts that the jury found Huffman and Sullivan credible. Therefore, we can comfortably conclude that had this factual issue been presented to the jury, it would have found as the district court did.

The district judge expressed no dissatisfaction with the guideline sentence. In fact, although Brinsfield requested a sentence at the bottom of the guideline range and the court had the discretion to impose such a sentence, it chose not to do so and sentenced Brinsfield to the middle of the guideline range. Thus, there is no reason to believe the court would impose a lower sentence on remand under a post-*Booker*

sentencing scheme.  *See United States v. Riccardi*, 405 F.3d 852, 876 (10th Cir.) ("Having exercised his limited discretion under the pre-*Booker* system to give Mr. Riccardi the highest permissible sentence, there is no reason to think the judge would exercise his now-greater discretion to reduce the sentence."), *cert. denied*, 126 S.Ct. 299 (2005); *see also Waldroop*, 431 F.3d at 743 (same); *United States v. Dowell*, 430 F.3d 1100, 1112-13 (10th Cir. 2005) (finding non-constitutional *Booker* error harmless where the district court exercised its discretion to impose a sentence in the middle of the guideline range, thereby giving us no reason to think the court would impose a different sentence on remand).

The district court's constitutional *Booker* error at sentencing was harmless beyond a reasonable doubt in that it did not affect Brinsfield's substantial rights.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge